RAY PARKS, APPELLEE v. WILLIAM W. METZ ET AL., APPELLANTS.

299 N. W. 643

FILED JULY 25, 1941. No. 31076.

*Lloyd E. Peterson,* for appellants.

*Clarence G. Miles* and *Thomas E. Dunbar, contra.*

Heard before PAINE, CARTER and MESSMORE, JJ., and ELDRED and TEWELL, District Judges.

ELDRED, District Judge.

This is an automobile damage suit. Plaintiff, appellee, is seeking to recover for personal injuries and property damage arising out of a collision between an automobile owned and driven by plaintiff and a Studebaker one-ton truck owned by the defendants William W. Metz, Frank B. Chapin and William A. Williams, doing business as Greene's Ice Cream Factory, and driven by the defendant Kenneth Conaway, at an intersection about one mile west of Avoca, on state highway No. 50, an arterial highway extending north and south, and a county highway extending east and west, and having stop signs. Defendants filed cross-petition for property damage to their truck. On trial there was a verdict and judgment in favor of the plaintiff and against defendants. Defendants have appealed. Appellants' first assignment of errors relied upon for reversal is: "The court erred in failing to direct a verdict in favor of the defendants at the close of plaintiff's case;" and, second, "The court erred in failing to direct a verdict at the close of all the evidence." These assignments will be considered together.

The specific acts of alleged negligence charged by plaintiff against defendants in his petition, and submitted by the court to the jury, in substance, are: That the driver of said truck was not maintaining a proper lookout for those crossing said intersection; that he was driving said truck at a high and excessive rate of speed under the circumstances; and that, after seeing plaintiff in said intersection, failed and neglected to slacken the speed of said truck, but drove the said truck at high speed directly toward and against plaintiff's automobile.

The specific acts of alleged negligence charged by defendants against plaintiff, and submitted by the court to the jury, in substance are: In failing to bring his automobile to a stop and allowing traffic upon said arterial highway to proceed without obstruction; in failing to give the defendant Conaway warning or notice of his approach; in disregarding the condition of the highway; and in failing to keep a proper

lookout for traffic approaching and entering said intersection from the north, and to observe the truck driven by defendant Conaway in time to avoid a collision therewith; or if he saw the approach of said car of defendant in time to avoid collision therewith, then in failing to avoid said collision.

The evidence pertinent to cause of collision discloses that state highway No. 50 is an arterial highway with a graveled surface and well maintained, extending north and south a short distance west of Avoca. On the date of the collision involved herein, a county highway with graveled surface and extending east and west intersected highway No. 50 about one mile west of Avoca. This county highway has stop signs on both sides where it intersects the arterial highway No. 50. On September 15, 1939, at about 3 o'clock p. m., the plaintiff, a man 55 years of age, was traveling west from Avoca on said county highway, driving his 1933 Terraplane four-door sedan. The refrigerator truck of the defendants Metz, Chapin and Williams, weighing 5,200 pounds without load, was at the same time being driven by defendant Kenneth Conaway, 24 years of age, south on highway No. 50, and was carrying about one-half load. The day was clear; the collision occurred at the intersection of said roads, the point of contact being about the center of the east and west road, and about three feet east of the west line of the traveled portion of the north and south road. Both drivers had been over the road at place of collision many times before. After collision plaintiff's car was in ditch at southwest corner of intersection, lying on right side, front end facing about west; the defendants' truck was about a quarter of a mile south at bridge at foot of hill.

Plaintiff testified that he was a salesman of hog and poultry minerals and did culling of poultry. On the afternoon of September 15, 1939, at about 3 o'clock, he was going from Avoca to one Moore's, about one and one-half miles west of Avoca, traveling in a 1933 four-door Terraplane, on graveled highway to highway No. 50 one mile. "I knew there was a stop button there and there was a hill, and

when I went down there to the stop button, I stopped, * * * and then started up slow, because there was a ridge where the maintainer had been by, and started in low and looked up the hill to the north; looked south, and couldn't see any car coming and I got about half-way across and I heard a roar and I looked up and here was a big white truck right on me and when it hit me it seemed to just raise me right off the ground and it came down on the same side that it hit me; came down on the right side. * * * A. Well, I stopped at the stop button and I couldn't say whether I was by it or just even with it." When started up after stopping, started in low; was alone that day; had driven cars since 1914; able to judge speed of car very closely; entered intersection at about five or six miles an hour. When he first knew of the approach of the truck which struck him, he was about the center of the intersection or a little past. Proceeded directly west on right side, or north side of crossroad; on north side of east and west highway. "When he hit me it raised the car right off the wheels; it seemed to go right up in the air and it went in the ditch, and when I got squared around I was down in the bottom on the right door and then I tried to get up two or three times and finally I got up and stood with my head and shoulders out through the other door. I couldn't hardly get up I hurt so through my chest and my arm. I could only use one hand to get stood up. My head was cut and there was blood all over me. I could only see out of one eye; the blood was running over my right eye and I finally got stood up through the door and pretty soon a young man came along there and tried to get me out." Car was on right side. "The Court: How far away was the truck when you first saw it? A. Well, I would say a couple hundred feet. The Court: Did you observe its approach from that distance up to the time it hit you? A. I heard it roar and I looked up and it seemed to be coming right at me, I would judge, a couple of hundred feet away. The Court: You saw the truck two hundred feet away? A. I would imagine about that. The Court: What did you do then? A. Well, I naturally glanced ahead to see if I could

get away. The Court: How close was it to you when you saw it again? A. It was right on me and I was up in the air. The Court: It hit you? A. It hit me. Q. Do you know, Mr. Parks, whether or not the truck turned in its course from a straight north and south direction; just answer that 'yes' or 'no'? A. Yes. * * * The Court: You say you know whether the truck approaching you changed its course. If so, which way did it turn, approaching you? A. It headed right towards me. The Court: It never turned then? A. Kind of slaunch-ways. The Court: What do you mean by 'slaunch-ways?' A. I just don't know how to explain it. Q. Which way did the truck then seem to turn from the time you first saw it? * * * A. It came fully at me then. * * * Q. You say that you stopped at the stop sign? A. Yes, sir. Q. And from the stop sign you could see both ways? * * * A. Yes, on the highway No. 50 you can see south a long ways and north you can't see so far. * * * Q. Well, where you stopped how far north can you see? A. Well, I would say three or four hundred feet. Q. You can see to the top of the hill? A. No, sir. Q. You can see to the top of the hill from the edge of the road, can't you? A. Yes, sir. Q. You didn't stop at the edge of the road? A. I went slow at the edge of the road—let it roll down there. Q. Before you went into that intersection you could see to the top of the hill and there was no car coming? A. No, sir; you can't see to the top of the hill. Q. You can't? A. No. sir. Q. Because of the obstruction at the corner? A. Yes, sir. Q. So you stopped at a place where a view of the highway to the north was obstructed? A. To the top of the hill I couldn't see; no. Q. Did you at any time bring your car up to the edge of the road and stop it where you could see in both directions as far as the road extends to the north and south? A. Yes. Q. Where did you stop then? A. No; I didn't stop then. It rolled up there. I let it roll up there and looked both ways. I could see clear to the top of the hill from there, probably five or six hundred feet. * * * Q. And there wasn't any truck in sight then? * * * Q. As far as you could see back, anyhow six hundred feet, there wasn't any car coming? A.

No; as far as I could see up the hill there was no car coming. Q. Then you pulled directly onto the intersection? A. Yes, sir. Q. And that instant you were hit? A. No, sir. Q. Where were you hit? A. I got past the middle when I heard the roar and I was past the middle when it hit. Q. How far past the middle? A. I couldn't say; a few feet. Q. You were driving five miles an hour? A. I was in low, driving five to six miles an hour. Q. You hadn't shifted your gears yet? A. No, sir. Q. You never stopped after you stopped at the stop sign though? that is, you didn't make two stops? A. No; I didn't make two stops."

Allen Paap had been over road many times. "Q. What would you say with reference to obstruction of view? A. Well, there isn't a very good view. It isn't very well cleared and there is more or less of a little embankment there. Q. Embankment and high weeds, were there at that time? A. That is the way I looked at it; yes. Q. Any brush there? A. I wouldn't say as to brush there. There had been hedge there, but the hedge was cleared." It is about 750 to 800 feet from the intersection to the top of the hill north. It is about 30 or 35 feet from where the plaintiff's car was lying in ditch to the center of the intersection.

H. H. Caswell, of the state safety patrol, who with Patrolman Nelson investigated accident, was called by defendants. Arrived there at around 3:45 p. m. "The first thing we did was try to determine what had taken place as far as causing the accident was concerned and tried to find out where the impact of the accident was; that is, the spot in the intersection where the cars came together. * * * Well, we could see skid marks on the gravel road and mud that had fallen from the cars. * * * That was in the west side of the intersection. Q. At what point? * * * A. Well, in drawing a line, we measured the width of the traveled portion of the north and south road. We measured with a fifty-foot steel tape, twenty-one feet of traveled portion. Drawing a line directly through the east-west road; that is, along the west side of the north and south road through the intersection, the point of impact was three feet from where this line

would be; three feet east of this line. * * * Drawing a line, if it wasn't for the intersection, I mean, the east and west road, it would be three feet from the west edge of the road. The Court: Of the traveled portion? A. That is right. The Court: Of the west edge of fifty? A. Of fifty, the north and south road." Point of contact almost in center of the east and west road. Examined the truck; the left front wheel brake cable was torn loose from the drum. There was a gravel ridge along the west side of the highway No. 50. Plaintiff's car 35 feet south of stop sign on the west side of the road, 42 or 43 feet from where skidding started. Skidding started at the west edge of the intersection, west edge of north and south road and approximate center of east and west road—of the traveled portion of highway No. 50. Truck was 1,500 feet from intersection. Highway directly south is almost level for 100 yards and then downhill.

Ernest Klein, called by defendants, worked on defendants' truck. Both hydraulic brakes and mechanical brakes could not be effectively operated. Left front headlamp was damaged. "Q. Which side of this truck was damaged the most, the right or left? A. There wasn't a lot of difference. I think the blow came mostly on the left side."

Defendants called Charles A. Shannon, a civil engineer. Top of hill to center of intersection, elevation is 32 feet lower; from center of intersection to bridge, elevation is 45 feet lower and distance is 1,480 feet. Top of hill to bridge, total drop is 77 feet. Total distance from point on top of hill from which measurement was taken to intersection, 1,020 feet. From top of highest point of hill to intersection, distance is 850 feet. Little less than 4 per cent. grade from top of hill to intersection.

Kenneth Conaway, defendant, called as a witness by defendants: Truck is refrigerated truck, Studebaker, one-ton capacity. At time of accident one-half loaded. Was driving from 40 to 45 miles an hour approaching intersection. Truck was in perfect condition. "I was going south from U. S. 34 there, and I wasn't driving fast that day

on account of it was always getting hot, and I started down the hill there and I couldn't see any one, and about thirty feet from the intersection, why a car drove into the intersection about fifteen miles an hour and I put on my brakes, but that is all the good it did, it drove in so quick I hit him and my hood flew up over the windshield and I couldn't only see out through just a crack underneath the bottom of the windshield where the hood wasn't clear covering it, and it started for the ditch and I had a hard time keeping it in the road, from going over in the ditch, and then I tried to put on my brakes and they were shot, the hydraulics were, and then the hand brake, it was loose, the frame had been bent, and it was going about two or three miles an hour, just creeping along, and I couldn't do nothing to stop it. I had a hard time keeping it in the road. I didn't even get clear across the bridge at the bottom of the hill. A road grader patrolman came along and pushed me across the bridge afterwards. I put out my flags. Q. As you drove into this intersection and this car came in front of you, what did the driver do, if anything? A. Well, he never looked until right before I hit him. He was looking straight ahead and he never seen me until right before I hit him. Q. You didn't see him turn his head to the right or left? A. No. Q. Until just before the collision? A. Yes, sir. Q. And then what did he do? Did he look up then just before the collision? A. Yes; he looked right up before the collision. Q. What did you say you estimated his speed to be? A. About fifteen miles an hour. Q. What do you estimate your speed to be at the time just before the impact took place? A. About forty miles, I should judge. Q. Did you apply your brakes? A. Yes; but notwithstanding I couldn't keep from hitting him. Q. You first saw him how far away? A. About thirty feet. Q. Kenneth, with reference to this intersection, did you examine that intersection that afternoon; that is, the northeast corner? A. Yes, sir. Q. What was indicated there, what did you see? A. Well, you couldn't see any one coming from the side roads. A person has got to pull out there to the edge of the highway to see them, and he didn't

do that." Was driving on right side of road immediately before the accident, to the west. No roar in automobile that day. Speed when hit plaintiff's car was little over forty miles.

William A. Williams, defendant: "The stop sign is approximately five feet, I would say, east of the north and south fence line. To see to the top of the hill I had to drive my car until the rear bumper was even with the stop sign, which would put the length of my car west of the stop sign."

On this evidence bearing upon the question of negligence and contributory and comparative negligence the trial court submitted the case to the jury. Defendants' principal argument is that the evidence established that the plaintiff was guilty of more than slight negligence, and that the question was, therefore, one of law for the court. There is no dispute as to that rule, if applicable under the facts in this case. That question must be considered in the light of the rule:

"A motion for a directed verdict must, for the purpose of a decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and said party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the facts in evidence." *Moncrief v. Interstate Transit Lines,* 129 Neb. 168, 261 N. W. 163.

As to what actually occurred at and immediately preceding the collision, we have no direct evidence except the testimony of the drivers of the two vehicles. Both drivers were familiar with the intersection. It would appear from plaintiff's testimony that he stopped at stop sign; he started in low and looked up the hill to the north, looked south, and could not see any car coming; could not say "whether I was by it or just even with it." That from where he stopped he could see north 300 to 400 feet; that he went slow to the edge of the road; let it roll up then and looked both ways; could see clear to the top of the hill from there, probably 500 or

600 feet, and there was no car coming. Continued directly west across highway with car still in low and driving 5 or 6 miles an hour. That he first saw the truck when about 200 feet from him. That it headed right towards him "kind of slaunch-ways;" it came fully at him. That plaintiff nearly succeeded in clearing the crossing is indicated by the fact that the place of contact was about 3 feet east of the west line of the traveled portion of highway No. 50. That defendants' truck evidently veered a little to the right before striking plaintiff's car would appear from the fact that it propelled plaintiff's car in a southwesterly direction and from the fact that force of contact was on left front of the defendants' truck. If plaintiff was going as slow as he claims, 5 or 6 miles an hour, or even as slow as defendant claims, 15 miles an hour, the truck driver might have seen plaintiff's car long before he claims he did, and could have diverted his truck so as to have passed behind plaintiff's car, had he been keeping a proper lookout. The force of the contact of the defendants' truck and the distance it propelled plaintiff's car, and the distance defendants' truck traveled after the collision, the road being almost level for first 100 yards, is a circumstance indicating something of the speed of the truck at the time of the contact.

Space will not permit a complete analysis of the evidence in this case. The evidence is conflicting, and from the facts and circumstances proved, we conclude that reasonable minds might draw different conclusions concerning any negligence or lack of negligence, as well as comparative and contributory negligence, and that the trial court did not err in submitting such issues to the jury. *McDonald v. Wright,* 125 Neb. 871, 252 N. W. 411.

The only remaining assignment of error is the refusal of the trial court to give instruction No. 2, requested by the defendants. By the second paragraph of the requested instruction the court was asked to advise the jury, "That an automobile approaching an intersection from the left only has the right of way where it arrives at the intersection so far in advance of the car on its right that a reasonably pru-

dent person would be justified in believing that he could clear the intersection before the other car arrived there." This request does not state the rule in this state. The rule would seem to be that a vehicle reaching and entering an intersection first shall have the right of way. *Schrage v. Miller*, 123 Neb. 266, 242 N. W. 649; Comp. St. 1929, sec. 39-1115; Comp. St. Supp. 1939, sec. 39-1148, subd. (b).

The first paragraph of the requested instruction sets out rule,—"Where two vehicles approach an intersection * * * at approximately the same time, the vehicle approaching from the right shall have the right of way." That provision of the statute is applicable where intersection is not protected by "stop signs." Under the evidence in this case such instruction was not pertinent to question involved and was not required. The trial court did, on its own motion, give an instruction under the provisions of section 39-1036, Comp. St. Supp. 1939: "All motor vehicles entering or crossing state highways on which stop signs are erected shall come to a full stop as near the right of way line as possible, before entering onto such state highway, and, regardless of direction, shall give the right of way to vehicles upon said highway." This instruction was applicable under the issues in this case, and fully protected the interests of the defendants. There was no error in the refusal of the requested instruction.

Judgment of the trial court

AFFIRMED.