MAE MCINTOSH, APPELLANT, V. UNION PACIFIC RAILROAD COMPANY, APPELLEE.

22 N. W. 2d 179

FILED MARCH 1, 1946.   No. 31987.

*Bolus J. Bolus,* for appellant.

*T. F. Hamer, G. C. Holdrege,* and *R. B. Hamer,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action at law to recover damages to plaintiff's automobile, and for personal injuries sustained by her in a collision between such automobile and a train owned and operated by defendant.

The plaintiff's petition, for the purpose of determining this appeal, alleged substantially that the collision and damages proximately resulted from the negligence of the defendant, caused by: (1) Placing and maintaining on yard tracks, composing a part of the crossing, box cars and coal cars obstructing the view of this plaintiff and other motorists from seeing trains coming from the west, and by failing to remove the box cars and coal cars so stationed on the yard tracks prior to the arrival of a passenger train coming from the west and proceeding east, so that plaintiff's view of the oncoming passenger train would not be obscured; (2) failing to warn the plaintiff, and negligently failing to blow a whistle or ring a bell continuously at 80 rods west of the intersection of the crossing and its tracks to warn the plaintiff of the approach of its train coming from the west, contrary to section 74-573, R. S. 1943; and (3) failing to stop the train coming from the west before it collided with plaintiff's automobile, and in time to avoid striking the plaintiff.

The amended answer of the defendant contained a general denial; admitted a collision occurred, but denied that the collision was due to any negligence on the part of the defendant; and alleged that the collision was caused by the negligence of the plaintiff.

The case proceeded to trial before a jury. At the conclu-

sion of all the evidence the defendant moved for a directed verdict, for the reason the evidence is insufficient on which to base a cause of action in favor of the plaintiff and against the defendant, and for the further reason that the undisputed evidence shows plaintiff to be guilty of such contributory negligence as to bar any recovery against the defendant as a matter of law. The court sustained the motion. From the overruling of the motion for new trial, the plaintiff appeals, and predicates error on sustaining defendant's motion for a directed verdict as being contrary to the evidence and the law.

The established rule is that: "A motion for a directed verdict must for the purpose of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence." Roberts v. Carlson, 142 Neb. 851, 8 N. W. 2d 175; Parks v. Metz, 140 Neb. 235, 299 N. W. 643; Loudy v. Union P. R. R. Co., *ante* p. 676, 21 N. W. 2d 431.

In addition to the foregoing rule, it is necessary to bear in mind that: "Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination." Loudy v. Union P. R. R. Co., *supra*. See, also, Witthauer v. Paxton-Mitchell Co., *ante* p. 436, 19 N. W. 2d 865.

The record discloses, by exhibit number seven received in evidence, that the crossing involved is what might be called the Willow Street crossing in North Platte, Nebraska. To the north of the crossing is Seventh Street, and south of the crossing is Front Street. The scale of the map is, one inch thereon equals 20 feet on the ground. Starting from the north, the crossing is constructed of concrete to within three feet of the standard wooden crossing, then the crossings across the rails are standard wooden crossings, and ly-

ing in between are asphalt blocks. This construction extends approximately 200 feet south to the C. & I. tracks. From the C. & I. tracks south to the industry tracks, and before completing the crossing to Front Street, is concrete paving of an approximate distance of 120 feet, where it connects with brick paving. The street is 36 feet in width, and there is a sidewalk about 13 feet to the west of the west edge of the street pavement. The sidewalk is approximately five feet wide, extending north and south nearly the length of the crossing. Willow Street is intersected by 13 tracks of the defendant.

Exhibit number seven shows the distance from the center of the most northerly track, which is called the west belt track, south to the center of the eastbound main line to be 184 feet 8 inches. Proceeding south from the west belt track to the eastbound main line there are the following tracks: east belt track, east yard track number six, east yard track number five, east yard track number four, east yard track number three, east yard track number two, westbound main line, eastbound main line. South of the eastbound main line is the old coach track and the C. & I. track. Exhibit number seven gives the respective distances between these tracks, which need not be set out in this opinion.

The record further discloses that on September 15, 1943, the plaintiff, at about 6:00 or 6:10 p. m., on a clear day and after visiting her son, was proceeding south across the Willow Street crossing, driving her 1936 model LaFayette sedan. Before entering the crossing she looked both to the left and to the right. To her right, which would be to the west, there were cars stationary on the yard tracks. From the point where she entered the crossing south to yard track number six, where some cars were stationed, is approximately 70 feet, which gave her a clear vision to the west, the terrain being practically level and there being no obstructions, at least until she arrived at yard track number six. She was driving at a rate of speed of 10 or 12 miles an hour. The box cars and coal cars to the west were in close proximity to the sidewalk, and were north of the main line

tracks which run east and west, the main line tracks being south of the center of the crossing. It is not clear by the evidence whether cars were stationed on all the yard tracks, that is, on east yard track number six and the three yard tracks south thereof, numbers five, four, and three. The fireman testified he believed cars were stationed on all of such tracks. The distance from east yard track number six south to east yard track number three is approximately 50 feet. From the point where she would pass the cars stationed on yard track number three, to the place of the collision, which is the eastbound main line, is a distance of 54 feet or more, where her vision to the west was uninterrupted. She did not see the train until it was upon her.

The train struck her car at the rear of the front seat, moved it across the crossing and in between the tracks, and turned it around so that it faced west. The engine of the train proceeding from west to east on the eastbound main line, before it was stopped after the impact, was across the crossing to the east, with the first car blocking the street, and the engine and tender of the train approximately 90 feet east of the east line of the crossing. At the time of the impact she had nearly cleared the eastbound main line. The right window of her car was down; her hearing and eyesight were not impaired; and she heard no whistle or bell giving her warning from the train approaching from the west and proceeding east. She was extricated from the left door of her car and taken to the hospital, and was the only occupant of the car at the time of the accident; she was well acquainted with the crossing, having crossed over it approximately every day for 13 years, and had driven automobiles for 16 or 17 years, and could have stopped her car within eight or nine feet, or the length of the car.

The yardmaster testified that his duties consisted of instructing switchmen with reference to making up trains, and the general movement of trains and cars through the yards. On September 15, 1943, he was on duty from 3:00 p. m. until 11:00 p. m. Upon assuming his duties at 3:00 p. m. that day, there were no cars on yard track number

two, nor were any placed thereon subsequent to such time. Exhibit number seven shows yard track number two to be the second track north of the eastbound main line upon which the collision occurred. Likewise, there were no cars on the westbound main line, which is the first track north of the eastbound main line, upon which the collision occurred. Cars are stored on the storage tracks so as to clear the sidewalk west of the crossing proper. He did not know how many cars were parked on the tracks north of yard track number two on that date.

The yard clerk checks the entire yard, starting at 6:30 in the morning. This he did on the 15th and 16th of September 1943. There were no cars stored on yard track number two west of the Willow Street crossing on September 15th or 16th. On yard track number three there were 13 low-sided coal cars. One car was removed from this yard track on the 15th. Yard track number four was not checked because it was not a storage track, and on yard track number five there were 11 cars on September 15th, and 14 cars on September 16th. These cars were what are known as low and high-sided coal cars. The number of each type of car was not testified to, and the plaintiff's evidence is insufficient to show that the height of these cars obstructed her view to the west.

The car distributor designated the number of trains westbound and eastbound, passenger and freight, running out of North Platte, and the time that they left. There were no trains, either eastbound or westbound, passenger or freight, at this time, except the train involved in this collision, which carried deadhead equipment of 20 cars and was "extra 2265" due to arrive at the station, which was approximately four blocks east of the east side of the Willow Street crossing, at 6:30 p. m.

The callboy testified the accident happened at approximately 6:00 p. m., and he noticed the deadhead equipment at the block signal which was about two blocks west of the yard office, making the distance seven or eight blocks west of the Willow Street crossing. While riding his bicycle

from the yard office to Willow Street, he noticed two cars going south on Willow Street, which he stopped for, and saw another car proceeding south behind the first two. At that time he was about halfway across the Willow Street crossing, and when he started on across he heard this train whistling and looked back to see what was going on, but his view was obstructed by a building and he could not see the crash. At that time he was five or six feet east of the east line of the intersection of Willow and Front Streets, and the last time he heard the train whistle he was about in the middle of the intersection of Willow and Front Streets. He had heard the train whistle three or four times from the time he left the yard office; it was whistling for crossings, footpaths, and in to the station. There were no other trains using the tracks at that time. He went to the scene of the accident and observed that the train had caught the back end of the plaintiff's car and placed it in approximately the position as testified to by her.

The engineer testified that the deadhead equipment was being hauled by a regular road engine; that before entering the North Platte yards the train was going about 25 miles an hour; that coming into the yards the train whistled for a crossing at the yard limits, approximately three miles west of the Willow Street crossing, and for a crossing a half mile east of that, and for a crossing at the yard office, and the Willow Street crossing; that he likewise made a six-pound reduction in air before getting to the yard office, which partially set the brakes as the train passed the yard office; that he started to whistle for the Willow Street crossing where there was a whistling board to notify him of such fact, 500 feet west of the Willow Street crossing. He was on the right side of the engine and was blowing the whistle with his left hand on the whistle cord when the fireman "hollered" to him: "Hold her, an automobile." He dropped his hand and threw the air brake into emergency. At that time the engine was from 50 to 60 feet west of the Willow Street crossing, and the brakes took hold suddenly. The engine, after it struck the automobile, proceeded approx-

imately a car length from the point of impact. It pushed the car off the track, did not take it all the way down on the nose of the locomotive.

The fireman testified that in coming into North Platte the engineer whistled at all the crossings and turned the automatic bell, operated by air, on at a distance of approximately three miles west of the crossing, and the bell rang continuously; that some distance west of the Willow Street crossing he saw two cars just ahead of the train, which crossed the eastbound main line; he first saw the car with which the train collided about the time it came on the tracks farthest north, when the engine was approximately 200 feet from the west end of the Willow Street crossing. Obviously the train and the car were practically an equal distance ·from the point of the impact. The speed of the car was between 15 and 20 miles an hour, and the train 15 miles an hour. After noticing the two automobiles, he noticed the plaintiff's car coming from the north. She never stopped or slowed down, just kept on coming, and as the train got closer to the crossing he realized she could not stop, so he called to the engineer. At that time the engine was between 50 and 60 feet from the crosswalk on Willow Street, and the automobile was at a distance of 50 or 60 feet from the point of impact. The engineer, at the time, was whistling for the crossing. There were no cars on track number two, and he could see from his seat on the left side of the engine, which was about 12 feet in height from the ground the engine being at least 15 feet in height, the progress of the plaintiff's car as it proceeded south.

The evidence further discloses that the plaintiff could not tell with any degree of certainty the number, kind, or location of the cars stationary on the separate yard tracks of the defendant.

The foregoing constitutes the material evidence upon which the trial court directed a verdict against the plaintiff.

The plaintiff contends that the defendant violated section 74-573, R. S. 1943, which provides in substance, as follows: "A bell of at least thirty pounds weight, or a whistle, shall

be placed on each locomotive engine, and shall be rung or whistled at the .distance of at least eighty rods from the place where the railroad shall cross any road or street, and be kept ringing or whistling until it shall have crossed such road or street, * * * ."

Considering the positive testimony of the defendant's witnesses on this question, the rule in the case of Nanfito v. Chicago, B. & Q. R. Co., 103 Neb. 577, 173 N. W. 575 governs: "The testimony of witnesses, who were near the place of the accident at the time, that they did not hear the bell, without further explanation, is not sufficient to overcome positive evidence of reliable and competent witnesses that the bell was ringing." See, also, Tsiampras v. Union P. R. Co., 104 Neb. 205, 176 N. W. 366.

Even assuming, for the purposes of argument only, that the plaintiff adduced competent evidence that the engineer did not blow the whistle on the train for the crossing or that the bell was not ringing as required by statute, the cases of Askey v. Chicago, B. & Q. R. Co., 101 Neb. 266, 162 N. W. 647; Moreland v. Chicago & N. W. R. Co., 117 Neb. 456, 220 N. W. 692; Mundt v. Chicago, R. I. & P. R. Co., 136 Neb. 478, 286 N. W. 691; and Loudy v. Union P. R. R. Co., *supra*, are authority for the rule that where it is undisputed that a traveler on a highway failed to exercise reasonable precautions by looking and listening. at a reasonable point where he could have seen an approaching train in time to stop before reaching the tracks, his negligence, as a matter of law, will defeat a recovery for damages resulting from a collision with a train at a crossing, even though no signal by the locomotive bell or whistle was given as required by law.

The plaintiff, under the evidence and the circumstances, could unquestionably have stopped her automobile if she had exercised even the slightest care for her own safety. In this connection, it is well settled in this jurisdiction that it is the duty of a traveler on a highway, when approaching a railroad crossing, to look and listen for the approach of trains. He must look, where, by looking, he could see, and listen, where, by listening, he could hear, and if he fails

without reasonable excuse to exercise such precautions then he is guilty of contributory negligence more than slight, as a matter of law, and no recovery can be had for damages as the result of a collision with a passing train.

In Rickert v. Union P. R. Co., 100 Neb. 304, 160 N. W. 86, it was held: "A traveler upon a public highway, who attempts to cross a railroad track in front of an approaching train, if he knew, or ought to have known, of its approach, is guilty of contributory negligence which will prevent a recovery for resulting injuries, if the approaching train was in such close proximity to the crossing that a reasonably prudent person could not fairly expect to cross in safety ahead of it." Cases adhering to this principle are, Eggeling v. Chicago, R. I. & P. R. Co., 119 Neb. 229, 228 N. W. 361; Lewis v. Union P. R. Co., 118 Neb. 705, 226 N. W. 318; Haffke v. Missouri P. R. Corporation, 110 Neb. 125, 193 N. W. 257; Askey v. Chicago, B. & Q. R. Co., *supra;* Moreland v. Chicago & N. W. R. Co., *supra;* Mundt v. Chicago, R. I. & P. R. Co., *supra;* and Loudy v. Union P. R. R. Co., *supra.*

Clearly, under the evidence and circumstances as presented by this record, the plaintiff's negligence, as a matter of law, would bar her recovery.

The plaintiff contends that the defendant was negligent in permitting cars to be in a stationary position on certain of its yard tracks. The evidence shows that the cars were left upon the tracks in the ordinary course of the defendant's business. The fact that cars partially obstructed the view of persons passing over the crossing does not, of itself, render the defendant liable for accidents occurring there, but merely imposes a duty of greater care both upon the company and upon those who use the highway. See, Chicago, B. & Q. R. Co. v. Roberts, 3 Neb. (Unof.) 425, 91 N. W. 707; note to 47 A. L. R. 287; Bannister v. Illinois Cent. R. Co., 199 Iowa 657, 202 N. W. 766.

We conclude the trial court did not err in sustaining the defendant's motion for a directed verdict.

AFFIRMED.