SHAFEEK FARAG, APPELLANT, v. PAULINE B. WELDON, APPELLEE.

80 N. W. 2d 568

Filed January 25, 1957. No. 34022.

*Ralph W. Slocum, Thomas J. Gorham,* and *Mark A. Buchholz,* for appellant.

*Davis, Healey, Davies & Wilson, Robert A. Barlow,* and *Kenneth Cobb,* for appellee.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by Shafeek Farag in the district court for Lancaster County, as plaintiff, against Pauline B. Weldon, defendant, to recover damages for personal injuries sustained by him when he was in the act of crossing a street and was struck by an automobile owned and being driven by the defendant. Trial was had to a jury. At the conclusion of the plaintiff's case the defendant moved for a directed verdict, which was overruled. The defendant then introduced her evidence, and at the close of all of the evidence the defendant moved for a directed verdict or, in the alternative, for a dismissal of plaintiff's case. This motion was sustained and the plaintiff's case was dismissed. Plaintiff appealed.

The plaintiff's petition charged the defendant with negligence which he alleges constituted the proximate cause of the injuries sustained by him, as follows: (a)

Failure to keep a proper lookout; (b) failure to yield to the plaintiff the right-of-way to which he was entitled; (c) failure to sound her horn or to give some warning signal to plaintiff; (d) failure to observe the plaintiff in time to stop or otherwise avoid hitting him; (e) failure to bring her vehicle to a stop in order to avoid a collision with plaintiff; and (f) failure to alter or divert the course of her vehicle in order to avoid a collision with the plaintiff.

The defendant, in her answer, denied negligence on her part; alleged that any injuries sustained by the plaintiff as a result of the accident were caused by negligence on the part of the plaintiff which was more than slight; and charged the plaintiff with negligence as follows: (a) He failed to maintain a proper lookout; (b) he failed to yield the right-of-way to defendant's automobile; (c) he failed to stop before running into defendant's automobile; (d) he saw, or by the exercise of ordinary care could have seen the defendant's automobile in time to have slackened his pace and avoided colliding with defendant's automobile, but failed to do so; (e) he failed to see defendant's automobile, or, if he did see it, he proceeded into the street in disregard of the knowledge thus acquired; and (f) he ran into the street and against the left front side of the defendant's automobile at a rate or pace which was unreasonable and improper.

The plaintiff's reply was a general denial of the defendant's allegations of negligence contained in her answer.

Q Street in Lincoln, Nebraska, is approximately 60 feet wide. Eleventh Street, at the intersection of Q and Eleventh Streets, is approximately 50 feet wide at the north end of the intersection and approximately 70 feet wide at the south end of the intersection. Q Street consists of brick paving and four traffic lanes, two for eastbound traffic and two for westbound traffic, which were marked at the time of the accident. On the north

side of Q Street west of the intersection is Dick's parking lot. The second traffic lane from the north curb of Q Street for westbound traffic is 9 feet wide.

The record shows that during the evening of August 11, 1954, the plaintiff and his family started in his car to go to the Labor Temple. They parked the car north of Q Street and on the west side of Eleventh Street. The plaintiff got out of the car and proceeded to the Labor Temple which is located in the middle of the block on the west side of Eleventh Street south of the intersection of Q and Eleventh Streets. The sky was overcast, and it was raining. The plaintiff remained in the Labor Temple 10 or 15 minutes and left to go back to his car. He testified that he was on the curb preparing to cross the street in the pedestrian lane when he saw a car approaching from the east in the second lane for westbound traffic, which would be the first lane north of the center of the street. This was the defendant's car. It was half a block to the right of plaintiff, or to the east. He started across the street, and when he was in the first lane north of the center of the street he saw the same car somewhere around the beginning of the intersection. He thought he would not be able to make it across the street walking, so he started to run, but did not run fast enough for the speed of the car, and it struck him. He saw the defendant's car coming toward him. He heard no sound of a horn, nor did he see the flicking of car lights or an attempt by the defendant to swerve the car. He had taken a few "speedy" steps to the north in an endeavor to avoid the accident. He was in no position to see or know what part of the defendant's car struck him. He was wearing a white shirt with an open collar, greenish-gray trousers, and black shoes. He was also wearing his glasses. After being struck by the defendant's car, he was lying on the ground on Q Street. People were gathering around. He had the keys to his car in his hand and gave them to a gentleman and asked him if he would be kind enough to take

his family home. He was taken in an ambulance to a hospital where he received medical attention.

On cross-examination the plaintiff testified that he approached the intersection to cross the street about 8 p.m. There was nothing to interfere with his vision. The light was "fairly good." When he first saw the defendant's car he was on the sidewalk a couple of steps south of the curb. There was no other traffic on the street except a vehicle following the defendant's car. He stepped out into the street and proceeded across the intersection, watching the defendant's car all of the time. When he reached a point approximately in the middle of the inside lane for westbound traffic, the defendant's car was just to the east of the intersection and in the inside lane for westbound traffic. At this point the plaintiff took a few "speedy" steps to the north. He could not estimate how many. As the plaintiff crossed to the center of the street, he watched the defendant's car. He did not stop at the center of the street because he presumed he had the right-of-way. The plaintiff further testified that by "a few speedy steps" he did not mean that he was running, and that he did not run from the time he left the Labor Temple up to the time of the impact. In a deposition taken before trial the plaintiff said he watched the defendant's car right up to the time of impact. He also said: "I wouldn't have run if I hadn't watched" and "* * * I was trying to get out of the rain as soon as possible, and in this case the rain can speed the pace."

A witness for the defendant testified that about 8 p.m., the night of the accident, he was driving east on Q Street in the traffic lane nearest the south for eastbound traffic. He stopped his car with its front wheels about 3 feet from the west side of the cross walk on Eleventh and Q Streets preparatory to making a right turn onto Eleventh Street. He saw a man dressed in a white shirt and dark trousers, which later proved to be the plaintiff, who looked at his car and ran in front of

it with his head down as if "bucking the rain." He was running at an angle. There is a parking lot on the northwest corner of Eleventh and Q Streets and a driveway into the parking lot approximately 50 feet west of the northwest corner of the intersection of Eleventh and Q Streets. The plaintiff was running toward this parking lot. This witness proceeded to make the turn, and as he proceeded a few feet, he heard a thud. He parked his car and ran to the scene of the accident. He saw the plaintiff north of the center line of the street and 3 or 4 feet west of the driveway to the parking lot. He was lying with his head to the north and looked as if he was doubled up, with his feet pulled up. The back of the defendant's car was almost even with the plaintiff's body.

On cross-examination this witness testified that he saw cars coming from the east. The first time he looked they were about half a block distant from him. The plaintiff at that time was standing on the curb. He did not see the plaintiff after he passed in front of his car.

A witness who had been driving a truck about 50 feet behind the defendant's car from Thirteenth and Q Streets testified that he was traveling from 20 to 25 miles an hour and was in the north lane for westbound traffic. The defendant was in the inside lane for westbound traffic. The lights on the truck were on and the windshield wipers were working. There was a light rain falling at that time. The defendant's car had its taillights burning. He saw the plaintiff running diagonally from the south side of the street to the north side of the street. The plaintiff was a little north of the center line of the street and 5 or 6 feet southwest of the driveway to Dick's parking lot. The left front fender of the defendant's car struck the plaintiff. At that time he saw the brake lights come on. The defendant's car was in its own lane of traffic. The defendant stopped her car in about half a car length. The plaintiff was lying about that distance behind the defendant's car. The

defendant's car did not drag the plaintiff any distance. This witness stopped his truck and went to the scene of the accident, being one of the first to arrive. The plaintiff was lying on the ground half a car length back of the defendant's car, on the south side thereof. The plaintiff handed the keys to his car to this witness who later gave them to the plaintiff's wife. Thereafter, the ambulance came and took the plaintiff away.

On cross-examination this witness testified that he was halfway across the intersection when he first saw the plaintiff who was almost across the intersection. He could see over the defendant's car because the seat of the cab of his truck was about 2½ feet higher than an ordinary passenger car. He saw the accident when it happened. The plaintiff was running across the intersection with his head down. It seemed as though he ran right into the side of the left front fender of the defendant's car. It was raining at the time.

A police officer charged with the duty of investigating traffic accidents and making reports on them testified that he came to the scene of the accident shortly after it happened; that the sky was overcast; that it was very dark and raining; and that the street lighting on Q Street was very poor. He observed two cars near the scene of the accident, one car to the northwest of the plaintiff and the other to the rear of that car. He talked to the plaintiff and obtained his name. Shortly after that the plaintiff was put into an ambulance. The officer made a check of the area from the east side of the west cross walk to the point where the car driven by the defendant had stopped. He found some broken glass and mud lying on the street. The glass was from the headlight lens of the defendant's car. The glass and accumulation of mud was 3 feet north of the center line of Q Street and 68 feet west of the west curb of Eleventh Street on the south side of Q Street. This, as he later testified, was the point of the impact. He examined the defendant's car. The left headlight was broken out

and there was a small indentation to the left of the left front headlight on the rounding portion of the left fender, just back of the chrome strip around the headlight. This indentation was not present prior to the time of the accident, as testified to by the defendant's husband who examined her car a day or two prior thereto. The plaintiff was lying with his head in a northwesterly direction, his feet in a southeasterly direction, and he was at a slight angle very near the center of the street, a few feet west of the accumulation of glass and mud and south of the defendant's car. The defendant's car had traveled a distance of 12 feet from the point of the accumulation of glass and mud. The windshield wipers on the defendant's car were operating and the right headlight was burning. The brakes were in good mechanical condition. The officer finished his investigation between 8:40 and 8:45 p.m. He then left the scene of the accident and went to St. Elizabeth Hospital where the plaintiff had been taken in the ambulance. At the hospital he had a conversation with the plaintiff just before some X-rays were to be taken, and asked him for the details of the accident. The plaintiff told the officer that he had been at the Labor Temple and he was proceeding back to his car which was parked in Dick's parking lot; that he had entered Q Street coming from behind two parked vehicles and ran across the street with his head down due to the fact that it was raining; and that he did not see any vehicle before the accident. Thirty or 40 minutes later, after the X-rays were taken and developed they were shown to this witness. The doctor and this witness went to the plaintiff's room. The plaintiff's wife was there and a nurse, or nurse's aide. The plaintiff was in bed, and the officer again asked him to give him the story of the accident. The plaintiff repeated the story in substance as heretofore set out.

On cross-examination the officer testified that there were no skid marks. He talked to the defendant about 8:25 p.m., when she was in the immediate vicinity of

the accident. She made a statement that she did not see the plaintiff until her car struck him.

The defendant testified that she traveled about 20 to 25 miles an hour, and as she approached the intersection of Eleventh and Q Streets she slowed down and looked through the space cleared by the windshield wipers which were operating as it was raining. She observed no one on the cross walk or on the west side of Eleventh Street, and there were no cars to interfere with her driving the direction she was going. She stepped on the gas to move forward, as she had taken her foot off the gas pedal while approaching the intersection. As she proceeded into the intersection, there was a car approaching slowly from the west in the outside lane for eastbound traffic on Q Street. As she started across the intersection this motorist was somewhere beyond the mid point of the block between Tenth and Eleventh Streets. As she proceeded into the intersection, shortly after crossing the cross walk area, a "silhouette" appeared before her in the form of a man with his right arm extended in a position such as if he was about to go over a hurdle. By "silhouette" she meant that there was no light from her direction on the figure she saw. The lighted area on Tenth Street made the form appear black to her. This "silhouette" appeared directly over the headlight on the left front fender of her car. There was an impact. She saw the "silhouette" practically at the time of the impact. After the impact the plaintiff's body rolled off to the left of her car, with his head and shoulders toward her. She stopped her car and went back to where the plaintiff was lying, approximately half a car length back of her car, to the left or south thereof. He was flat on his back with his hands up. She looked to the north and saw a man, and called to him to get an ambulance and to call the police. The plaintiff's head was to the north and his feet to the south. She bent over him to protect his face from the rain. He immediately rolled on his left side and pulled his knees

up. She asked him his name and he told her.

On cross-examination she testified that she told the police officer that she did not see the plaintiff until his "silhouette" was in front of her. She further testified that she did not sound the horn before the impact; that she did not turn her car or divert its direction prior to the impact; that she made no attempt to stop her car before the impact; and that she saw the plaintiff an instant before the impact and not before that time.

The plaintiff's assignments of error may be summarized as follows: The trial court erred in dismissing the plaintiff's cause of action on the grounds that it was not sustained by the evidence. The judgment of the trial court dismissing the plaintiff's cause of action is contrary to law.

In considering the above assignments of error, and from a review of the record, we deem the following to be applicable to the instant case.

It is well established in this jurisdiction that upon a motion for a directed verdict at the conclusion of all of the evidence, the motion must be treated as an admission of the truth of all of the material and relevant evidence admitted and all proper inferences to be drawn therefrom.

To justify the direction of a verdict, it is not necessary that there should be literally no evidence to go to the jury; it is sufficient if there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established. See, In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181; In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176.

In Belville v. Bondesson, 130 Neb. 926, 266 N. W. 901, a case involving a pedestrian crossing a street and being struck by an automobile, this court said: "In examining the question of plaintiff's contributory negligence, it is necessary for us to formulate some idea as to what an ordinarily cautious and prudent man would do under like circumstances. We think he would act

about as follows: On reaching the intersection, he would look both to his right and to his left. Seeing that no cars were coming from the right that would endanger him before reaching the center of the street and determining that he could safely cross in front of cars coming from his left, he would proceed, being watchful of the cars whose traffic lanes he was crossing. Arriving in the center of the street, he would devote the greater part of his attention to cars coming from the south (in the instant case, cars coming from the east) whose traffic lanes he would cross in reaching the other side of the street, being alert, however, at all times, to the possibility that a car might appear where normally it would not be expected." See, also, Ring v. Duey, 162 Neb. 423, 76 N. W. 2d 433; Corbitt v. Omaha Transit Co., 162 Neb. 598, 77 N. W. 2d 144; Cuevas v. Yellow Cab & Baggage Co., 141 Neb. 662, 4 N. W. 2d 790.

In Corbitt v. Omaha Transit Co., *supra,* this court stated the following rule: "When one, being in a place of safety, sees and is aware of the approach of a moving vehicle in close proximity to him, suddenly moves from the place of safety into the path of such vehicle and is struck, his own conduct constitutes contributory negligence more than slight in degree, as a matter of law, and precludes recovery." See, also, Cuevas v. Yellow Cab & Baggage Co., *supra;* Ring v. Duey, *supra.*

The plaintiff, by his own testimony, saw the defendant's automobile approaching the intersection in its proper lane for westbound traffic when it was half a block to the east of him and before he stepped off of the south curb of Q Street to cross the intersection. He entered the street and continued to observe the defendant's automobile until he collided with it. He was in a position of safety while on the curb before he entered the street and while crossing the two lanes for eastbound traffic. At the center of the street he did not stop, but proceeded on, took a "few speedy steps" to the north, and collided with the defendant's automobile. The plaintiff could

have stopped or have stepped back when he reached the center of the street to protect his own safety, and when he was asked if he stopped at the center of the street he answered that he did not, and gave no reason for not doing so. He said: "I was continuing walking, presumably having the right of way."

Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination. See, McIntosh v. Union P. R. R. Co., 146 Neb. 844, 22 N. W. 2d 179; Corbitt v. Omaha Transit Co., *supra*.

The evidence in the case at bar clearly shows that plaintiff was guilty of more than slight negligence which defeats the recovery, in which case it is proper to sustain a motion for directed verdict for the defendant. McDonald v. Omaha & C. B. St. Ry. Co., 128 Neb. 17, 257 N. W. 489.

The plaintiff contends that he had the right-of-way and it was the defendant's duty to yield the right-of-way to him while he was crossing the intersection.

Section 39-751, R. R. S. 1943, provides in part: "The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any regular pedestrian crossing included in the prolongation of the lateral boundary line of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices. Every pedestrian crossing a highway within a business or residence district at any point other than a pedestrian crossing, crosswalk or intersection shall yield the right of way to vehicles upon the highway."

This statute does not relieve the plaintiff of responsibility for the result of his own contributory negligence. See Corbitt v. Omaha Transit Co., *supra*.

There is no evidence that the defendant was not driving her car in the proper manner and at a proper rate of speed. There is no evidence from which a reasonable inference would flow that the defendant had an opportunity, in the exercise of ordinary care, to avoid the accident. The evidence of the defendant, coupled with the evidence of the plaintiff, discloses that the plaintiff saw the approach of the defendant's automobile and stepped into its path under circumstances which did not allow the defendant time and opportunity, in the exercise of ordinary care, to avoid the accident. The evidence discloses the lack of due or ordinary care on the part of the plaintiff in crossing the intersection.

The conclusion reached is that the district court committed no error in dismissing the action of the plaintiff. The judgment is affirmed.

AFFIRMED.

WENKE, J., dissenting.

I dissent from the opinion of the majority which primarily holds that the record discloses that appellant was, as a matter of law, guilty of contributory negligence sufficient to defeat any right of recovery he might otherwise have. To me, based on the principle hereinafter set forth, the record as to that issue presents a question of fact for a jury. The principle I refer to is: Where a pedestrian approaches a street at a crosswalk and looks and sees an approaching vehicle on the street he is about to cross but erroneously judges its speed or distance or for some other reason assumes he can proceed with safety, the question of whether or not his conduct in doing so makes him guilty of contributory negligence is usually one for the jury.

In order to present what I consider evidence of a factual question in this regard I shall set forth certain questions asked appellant and his answers thereto. To make these questions and answers clear it will be necessary to set forth a plat of the intersection (exhibit 1 in the record) where the accident happened and certain

numbers placed thereon by appellant. It follows:

It should be remembered the evidence hereafter quoted is, for the purpose of this appeal, subject to the following principle stated in the majority opinion: "* * * upon a

motion for a directed verdict at the conclusion of all of the evidence, the motion must be treated as an admission of the truth of all of the material and relevant evidence admitted and all proper inferences to be drawn therefrom."

In setting forth the testimony it is not necessarily quoted in the order as found in the bill of exceptions but as it relates to the sequence of events as appellant approached and attempted to cross the intersection on the crosswalk. In this respect appellant, Shafeek Farag, testified as follows:

"Q- Now, Mr. Farag, as you came out of the Labor Temple and went up toward the intersection to the north, were you traveling at a rapid pace?

A- What do you mean 'rapid pace'?

Q- Well, —

A- Ordinary walking pace.

Q- Was it raining at that time?

A- It was raining.

Q- From the curb up to the center of this street you were just normally walking?

A- Normal walking.

Q- Now at any time from the time you left the Labor Temple until you reached the point of impact, did you run?

A- No.

Q- You have indicated * * * you were going out in the street crossing Q going north at the crosswalk?

A- Yes, sir.

Q- On the west side of 11th Street?

A- Yes, sir.

Q- Now when did you first see a car, if you remember?

A- I saw it when I was standing on this curb here (indicating).

Q- Will you please make a number '5' and put a

circle around it, the number indicating the point on Exhibit 1 where you were when you first saw Mrs. Weldon's car? (Witness complies.)

Q- * * * Where was Mrs. Weldon's car when you were at point '5'?

A- Somewhere along this street here (indicating).

Q- Well, could you estimate it in car lengths or some other unit?

A- No. I would say it was somewhere in the middle of that block (indicating). That is an approximation.

Q- Would it be fair to say approximately a half block?

A- Approximately.

Q- Now would you with that pencil put a number '6' on Exhibit 1 to show approximately where Mrs. Weldon's car was when you first saw it?

A- Supposing this is a block (indicating), call this a block. I don't know how far is a block, but supposing this is a block (indicating), then if the middle of the block would be here (indicating)—of course there are two lanes here (indicating)—then her car was in the middle of the block and it would be '6' here—middle of the block.

Q- Now tell what happened?

A- Then I started crossing the street—

Q- Well, had you stepped into the street before you saw her?

A- No.

Q- You were still up on the sidewalk on 11th Street?

A- Yes.

Q- And you had not reached the curb?

A- No.

Q- How far from the curb were you?

A- A couple of steps.

Q- And at that point when you were a couple of steps south of the curb, you saw Mrs. Weldon's car to your right approximately half a block away?

A- Yes.

Q- Now what other traffic, if any, did you observe on Q Street?

A- There was no other traffic in the street except a car coming after her.

Q- Now was there any traffic on the street west of the intersection and toward your left, as you went up to the sidewalk?

A- No, there was none.

Q- Now, Mr. Farag, I take it that your testimony is that you stepped out into the street—off the curb and onto the street, is that correct?

A- Correct.

Q- And did you watch the Weldon car?

A- I was all the time.

Q- And your testimony is that you proceeded north across the street?

A- Yes.

Q- And did you continuously watch the Weldon car up to the time of the impact?

A- Yes.

Q- You started crossing the street?

A- * * * when I was in the second—in this lane here (indicating)— Is that the inside lane?

Q- Yes.

A- The first after the middle line.

Q- Would you make an approximate circle and number it '3'? (Witness complies.)

Q- I believe your testimony is that '3', with a circle around it, represents where you were when Mrs. Weldon's car was at the beginning of the intersection. Is that correct?

A- Correct.

Q- Now you didn't stop at all at any time before you reached point '3', did you?

A- No.

Q- Now when you were at point '3' you saw, you observed, the Weldon car at that time?

A- Yes.

Q- And at that time you testified she had not entered the intersection on the other side of the street?

A- No, she was about at point '7,' where the place is marked "7.'

Q- How far over the center line were you?

A- Well, I was— I would say I was about the middle of the lane.

Q- And which lane?

A- Her lane. The lane in which her car was.

Q- That would be the inside lane for westbound traffic on Q Street?

A- Correct.

Q- Then is No. 3 supposed to represent approximately the middle of that lane?

A- Approximately so.

Q- Now what do you mean by 'the beginning of the intersection'?

A- Somewhere here (indicating).

Q- Now would you take—

A- Do you want me to write '7' here?

Q- Would you put a '7' with a circle around it? (Witness complies.)

Q- Is that correct that that '7' is intended to represent the position of Mrs. Weldon's car at the time you were at what you have—

A- In her lane.

Q- (Continuing with the question) indicated as '3' on this Exhibit 1?

A- Correct.

Q- That '7' you have placed on Exhibit 1 to represent the position of Mrs. Weldon's car when

you were at point '3' on Exhibit 1? Would that be the front end of her car?

A- What?

Q- The front end of her car?

A- What do you mean by 'front end of her car'?

Q- Well, the front of her car had proceeded up to point '7'?

A- Yes.

Q- Now, in your own words, tell what happened about that time.

A- Well, about that time I was hit by the other car— the car that was coming from this direction (indicating).

Q- You have later learned that was Mrs. Weldon's car and she was driving?

A- Yes, sir.

Q- Would you indicate with the number '4' approximately, if you know, where the car hit you at the intersection in the street there?

A- What do you mean by that exactly?

Q- Well, did you go further than '3'? You indicated you saw the car there.

A- Well, I would say I was somewhere around— well, here (indicating).

Q- Mark that with a '4'.

A- '4'.

Q- Now, Mr. Farag, is it correct that point '4' which you have placed on Exhibit 1, I believe you testified that that is where Mrs. Weldon's car struck you? Is that correct?

A- Approximately.

Q- You had taken— Is this right, you had taken a few steps further north?

A- Yes, a few steps—a few speedy steps.

Q- To the north?

A- To the north.

Q- When you got in the middle of the street or a little beyond it?

A- Yes.

Q- You have used the term, in describing your going from point '3' to point '4' on Exhibit 1 as a few speedy steps. Is that correct?

A- More than the usual pace that I was walking.

Q- When you used the term 'speedy steps,' would that be the same as running?

A- No.

Q- I think you stated you saw the defendant's car coming right towards you. Is that what you said?

A- Yes, sir.

Q- You took a few, is that the best—

A- I wouldn't be able to estimate how many.

Q- And the circle and number '4', or the circle around number '4', you placed that on there to represent the point of impact?

A- Correct.

Q- And that is a few speedy steps north of the point '3', which is the middle of the lane in which she was traveling?

A- Correct.

Q- She maintained a straight course?

A- She maintained a straight course, but I wouldn't state that she was exactly in the lane. She could have been a little off the lane or on the line, or it could be that way, because the street was wet."

If a jury believes this testimony, which it would have a right to do, it is my opinion appellant would not be guilty of any negligence which contributed to his injury sufficient to defeat any right to recover which he might otherwise have. I realize there is evidence to the contrary, including that of Charles Floyd Pidgeon who was driving a car east on Q Street and observed the manner in which appellant started across Q Street; that of Louis Plisek who was following appellee west on Q Street while driving a truck and who saw appellee's

car hit appellant; that of police officer Arthur A. Walker who talked with appellant that night at the hospital and who testified as to how appellant told him the accident happened; and that of appellee herself, including where the damage to her car occurred. All of this presents a very different picture as to the manner in which and where the appellant crossed the street and where the accident happened. In my judgment the final decision as to who was telling the truth in this respect is one of fact for a jury and not one of law for this court.

The majority opinion also infers the evidence does not disclose a situation from which a jury could find that appellee was guilty of negligence. First, in my judgment, section 39-751, R. R. S. 1943, has no application to the factual situation here presented. However, I think section 701(c) of Ordinance 5699 of the City of Lincoln does. It provides: *"Right of Way. (c) Pedestrians.* The driver of any vehicle upon a street within the city shall yield the right of way to a pedestrian crossing such street within any crosswalk; provided, however, at intersections where traffic is regulated by a traffic officer or an automatic traffic signal, the pedestrian, to be entitled to the right of way, must be proceeding in accordance with the directions of such traffic officer or automatic traffic signal regulating the movement of traffic at such intersection."

It was stipulated no officer was directing traffic at this intersection at the time of accident nor was the intersection controlled by an automatic traffic signal. It was therefore appellee's duty to yield the right-of-way to appellant if a jury believed his testimony as to how and where he was crossing the street and appellee cannot excuse herself by saying, as she did, that she did not see him through the space cleared on her windshield by the wipers until she struck him. She was duty bound to look and see what was in plain sight. Under this situation it is my opinion it was a question for a jury to determine whether or not she maintained a proper look-

out and, if not, whether such failure caused her not to observe appellant until it was too late to avoid hitting him.