In re Estate of Etta Benson, deceased. Grady Corbitt, Executor, et al., Appellees, v. Mary Hafer et al., Appellants.

46 N. W. 2d 176

Filed February 16, 1951.   No. 32882.

*William L. Walker, Roy A. Sheaff,* and *Earl Ludlam,* for appellants.

*Thomas J. Keenan,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a will contest in which the validity of an instrument purporting to be the last will and testament of Etta Benson, deceased, is involved. The will was admitted to probate in the county court over the objections of the contestant Mary Hafer. The objections to the probate of the will were: (1) That the will was not executed and attested as required by law; (2) that at the time of the making and executing of the will the testatrix was not possessed of sufficient mental and physical capacity to so make and execute the will, by reason of old age, mental illness, being under the influence of drugs and medicine and suffering excruciating pain due to a fatal heart disease; and (3) that the execution of the will was procured by the assertion of undue influence on the part of Mabel Hourigan, sister of the deceased, who by the terms of the will receives the largest share of the estate, and her husband, which deprived the contestants of an equitable distribution of the estate. From the admission of the will to probate in the county court, the case was appealed to the district court. In the district court Mary Hafer and Ella F. Stanley, sisters of the testatrix, DeVee Hourigan and Nadyne Marshall,

nieces of the testatrix, appear as contestants. A jury was impaneled and the case proceeded to trial. At the close of the evidence consisting of proponents' prima facie case and the contestants' case, the proponents moved for a directed verdict which was sustained. The district court entered judgment for the proponents and decreed the will to be the last will of Etta Benson, deceased. Upon the overruling of the motion for new trial filed by the contestants, contestants appeal.

The contestants predicate error in that the district court did not submit the case to the jury on the issues presented in the objections to probate. Under this assignment of error the question to determine is the sufficiency of the evidence to warrant submission of the case to the jury on the issue of testamentary capacity or undue influence.

In considering this question it is necessary to have in mind certain legal principles governing testamentary capacity, as follows: The mental capacity of a testator is tested by the state of his mind at the time he executed the will. If the testator knows the extent and character of his property, the natural objects of his bounty, and the purposes of his devises and bequests, he is mentally competent to make a will. In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37; In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284.

In the instant case, the proponents made a prima facie case in substance as follows: At the time of the drafting of the will Etta Benson was 72 years of age. The attorney who drafted the will testified that he had transacted business for the decedent at different times and had been acquainted with her for a period of 25 years preceding her death. On April 26, 1946, he drafted a will for her. On August 18, 1949, his law office was closed at noon due to the county fair in progress. He went to his residence, and about 3 p. m. Mabel Hourigan, a sister of the decedent, stopped at his home and informed him that Etta wanted to see him, but she did

not know when.  Later Mabel called him by telephone that Etta wanted to see him.  In response to the call he waited until Mabel could come and take him to her home where Etta lived.  When he arrived at the house Mrs. Frank Hafer, a sister of Etta, as well as Mrs. Will Hourigan and Mrs. DeVee Hafer Hourigan, nieces of Etta, and Mabel Hourigan were present.  He went into the bedroom where Etta was lying in bed.  He and she were alone, and he inquired of her what she wanted.  She said she wanted to change her will.  They went over the property she owned and in what respect she desired to change her will.  He was without pencil and paper, went into another room, procured the same, and made notes as to the manner in which she wanted the will drawn.  She discussed her relatives and said that in her previous will she had bequeathed $500 to a deceased brother's wife, and that they had an adopted son.  She wanted to know if she was legally bound to give her property to anybody.  She was advised in this matter. She wanted her sister Mabel Hourigan to have the entire half section of land she owned for the reason that she did not know how sick she was, and she wanted Mabel to take care of her, therefore she favored her in the will.  When the will was prepared he called Mabel Hourigan to come and get him and his secretary.  When he arrived at the Hourigan home he went into the bedroom to see Etta and told her he had prepared the will. She asked that it be read, and he read it aloud to her. She then said that was the way she wanted it and asked that a neighbor, Mrs. Pangle, be called as a witness to the will.  He held the will in his hand and asked Etta what it was.  She said it was her will.  He then asked her if she wanted Mrs. Pangle, his secretary, and himself to sign as witnesses.  She replied that she did.  She said she could not sign without her glasses, reached for them, put them on, and signed each page of the will and noted her signature properly on the last page of the instrument.  All three witnesses were present, saw

her sign, and then each signed as a witness to the will. Etta said at that time that it was her last will.

Mrs. Pangle testified that she had been acquainted with Etta Benson for 20 years, and that Etta lived with Stub and Mabel Hourigan and had so lived with them when they purchased the house across the street from this witness five or six years previously. She knew Etta was ill on August 18, 1949, because Dr. Hinrichs had been there about 2:30 p. m. She went over to find out Etta's condition. Mabel told her Etta was "pretty sick." It was about 6 p. m. when Mabel called her to come over and witness Etta's will. In all other respects she corroborated the testimony of the attorney, and gave as her opinion that Etta was fully conscious, talked normally, knew the witness, and that she stayed and visited with her a little while and asked her how she felt. She said she "would be all right if it wasn't for this pain in her chest," and asked this witness to call again.

The secretary corroborated the testimony of the other witnesses to the will, and testified that in her opinion Etta Benson was competent at the time she executed the will.

If the proponent makes a prima facie case as to testamentary capacity, it then devolves upon the contestant to overcome the presumption arising therefrom, after which the burden of going ahead and proving testamentary capacity by a preponderance of the evidence devolves upon the proponent. See In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203, and cases hereinbefore cited in this opinion.

It is well established in this jurisdiction that upon a motion for a directed verdict at the conclusion of all of the evidence, the motion must be treated as an admission of the truth of all of the material and relevant evidence admitted and all proper inferences to be drawn therefrom. See In re Estate of Scoville, *supra*.

We set forth the relevant and material evidence, not

in detail but sufficiently to discern the contestants' view thereof to sustain their contention with reference to the errors complained of.

Prior to 1903, Etta Benson married a Mr. Timmerman. They had one daughter, Georgia, who predeceased her. Etta obtained a divorce from Timmerman and her maiden name was restored to her. After she obtained her divorce she lived with her parents for a number of years. She kept house for her brother Charles before he moved to Iowa, then she returned to live with her parents for a short time. Later she went to live with her sister Mabel and her husband Stub Hourigan, worked for them as a cook in their restaurant most of the time except when she was in Omaha for a short time in 1927, and later lived with her daughter Georgia for about a year when Georgia was attending school in Lincoln.

Had Etta Benson died intestate, her heirs at law would be her sisters, Agnes Query, Ella Stanley, Mary Hafer, and Mabel Hourigan, and her nephew, the adopted son of her deceased brother Charles Benson.

The testatrix made two wills. One is dated April 26, 1946. This will, so far as material here, made the following devises and bequests: She bequeathed to her sister Agnes Query $1,000; to her sister Ella Stanley, $1,000; to her sister-in-law Stella Benson, $500; to her grandnieces, Shirley Hourigan and LeAnn Stratman, $500 each; to her niece Nadyne Marshall, $500; to her niece Constance Hourigan certain real estate in Geneva; to her sister Mary Hafer 80 acres of land; and to her sister Mabel Hourigan and her niece DeVee Hourigan one-half section of land.

In the second will, dated August 18, 1949, she eliminated the bequests to Stella Benson and Nadyne Marshall. She devised to Mary Hafer a life estate in the 80 acres of land, and the remainder to her daughter DeVee Hourigan; and devised to Mabel Hourigan the entire half section of land, and in the event the devisee

predeceased the testator, the land was devised to Constance Hourigan Ford.

It appears from the record that all of the witnesses agreed that during her lifetime the testatrix was an amiable person and desired to get along with her relatives, and her relations with them were at all times friendly.

Frank Hafer, brother-in-law of testatrix, testified that Etta purchased 80 acres of land that belonged to his father's estate and was adjacent to 80 acres of his. He farmed this 80 acres as a tenant, was permitted to farm it as he chose, and no question was raised between him and Etta on any business transactions that he had with her. He had occasion to see her and visit with her while she was in the restaurant whenever he had come to town. About two months prior to her death he talked with her and she told him she did not feel good. He saw her on August 14, 1949, about a week before she died, when she was in his home. He had a conversation with her wherein she said she was feeling bad. He also saw her on the morning of August 18, 1949, on the street. She told him she had had a bad spell in the "A. A. A." office. He later saw her that evening at the Hourigan home when she was in bed, and she was a "sick woman." He expressed no opinion as to her mental capacity to transact business.

He further testified that Charles Hourigan had priced a house to Etta. When she decided to take it and it came to making the deed Mabel wanted it, so she let Mabel have it. At the time Etta purchased a half section of land she talked to this witness about it, and he told her do do as she pleased, the money was hers. She intimated in another conversation that Mabel Hourigan objected to her purchasing this land, stating that she might be cheated in the deal. The evidence also shows that her attorney told her she was 72 years of age and not a farmer, and he did not believe it would be good business to purchase the land. Regardless of what any person or

relative told her, she did purchase the land for $21,500, which was estimated to be worth from $33,000 to $35,000 at the time of her death.

There is also some evidence that when the Hafers moved into a house Etta helped them, and on one occasion when she returned to help them she told them that she could not stand it much longer, that Mabel objected to her washing windows and working for the Hafers, and that if she continued to do so, Mabel would not put her foot in Mary's door any more. The Hafers told her that if she desired she might live with them. She thought she might and then later told them that in order to keep peace she would remain with Mabel.

Nadyne Marshall testified that in 1941, she and Etta discussed a will. Just what this discussion developed into is not clear. In 1947, when Etta was visiting Nadyne's home in Holdrege, Etta mentioned a will, saying: " 'Nadyne, you know that Mabel and "Stub" have just kept after me and kept after me until I finally made a will.' " She also told Nadyne that she had loaned $600 to Bill and DeVee Hourigan as a down payment on a house, and further stated: " '* * * in due course of time you will get the same amount of money.' "

DeVee Hafer Hourigan testified with reference to the $600 loan that she obtained from Etta to build a house, and also to another transaction when they desired to return to Geneva to live. They went to look at a house that was for sale but did not make up their minds to purchase it until they had seen it again. When they went the second time to see it they returned to Mabel and Stub Hourigan's home, and Mabel said that they had a proposition to make, that they would buy the house and DeVee and her husband could rent it from them on the basis of 10 percent of the investment. Shortly thereafter Etta came over to see DeVee and told her not to get mixed up in any deal of that kind, that she would let her have the money, because that wasn't right. She did loan $4,000 to DeVee and her

husband. This witness further testified that she was present on August 18, 1949, when the attorney was there with reference to the will; and that from her observation of her aunt Etta, she was in no mental condition to transact that kind of business. She further testified that her aunt had considerable pain when she was there at 9:30 p. m., and the doctor and nurse were trying to relieve it. She was very still and her eyes were closed.

Mary Hafer testified that Etta had been sick four or five months prior to her death; that Mabel seemed rather anxious to get in touch with the attorney to draw the will, and she heard nothing from Etta that would indicate that Etta was desirous of having the attorney come to see her or to transact business; that Etta's condition was bad; her eyes were shut; and Etta told her that she felt "terrible." From her observation she testified that Etta was in no mental condition to transact business such as executing the will at that time. When she saw Etta at 8 o'clock in the evening, her eyes were shut, she did not hear, and did not talk. Etta told Mary that Mabel had wanted her to make a will for so long, and she said she had made it.

Dr. Hinrichs testified that he treated Etta in his office on August 15, 1949. She complained of a pain in the precardial region. At that time the pain was of short duration and she had a tingling sensation in her fingers. He treated her for it. He saw her on August 18, 1949, about 2 p. m., at her home, after Mabel had called and said that Etta was having severe pain. His examination disclosed marked evidence of coronary difficulty. She had an ashen, gray pallor and marked evidence of pain in the chest region radiating down the left arm. He then described the treatment and the medicine that he recommended for her condition. She was given one-quarter grain of morphine by hypodermic. He testified to the effects of morphine on the system, and stated that the amount that he had given her would not affect her

mental capacity at any time. He saw her again at 7 p. m. that day when her pain was increasing in intensity. She was given three-eighths of a grain of morphine at that time. She complained that her pain was more severe than before. He next saw her between 8:30 and 9:30, shortly before she was taken to the hospital. Her conversation showed to him that she was aware of what she was doing and what was going on about her. They discussed the question of taking her to the hospital, and her reaction indicated that she was completely competent. Throughout the trip to the hospital her mental condition was good.

The financial circumstances of the relatives of the testatrix were admitted in evidence. It appears that the contestants made no particular complaint about their financial condition, and in the main did not discuss their financial condition at any time to any extent with the testatrix. While some complaint is made that the trial court excluded the financial condition of Mabel Hourigan, it was pretty well known to the testatrix as the record reflects. The testatrix made certain loans to some of her relatives for which they gave her their notes, and she was rather lenient in her requirements as to when the same should be paid. This evidence principally relates to her nieces. The sisters contesting the will, Mary Hafer and Ella F. Stanley, did not discuss their financial condition with the testatrix, and in fact there is evidence disclosing that they were rather independent.

In order that a will may be rejected on the ground of incompetency of the testator the evidence of the contestant must be sufficient to sustain a reasonable inference that the testator was incompetent to make a will. It is the duty of trial courts to determine the issues upon which there is competent evidence and submit them, and them only, to the jury. In a will contest on the ground of mental incompetency and undue influence, if the evidence is insufficient to sustain a verdict upon either of such issues in favor of the contest-

ant, then the trial court should withdraw both issues from the jury and direct a verdict. See, In re Estate of Inda, *supra;* In re Estate of Scoville, *supra.*

To justify the direction of a verdict, it is not necessary that there should be literally no evidence to go to the jury; it being sufficient that there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established. See, In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181; In re Estate of Scoville, *supra.*

"A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument." In re Estate of Bose, 136 Neb. 156, 285 N. W. 319. See, also, In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513.

We conclude, in the light of the foregoing authorities and the evidence adduced in this will contest, that the trial court did not err in not submitting the issue of testamentary capacity to the jury.

The next question to determine is whether or not the trial court erred in not submitting to the jury the issue of undue influence alleged to have been practiced on the testatrix by Mabel Hourigan, sister of the testatrix, and her husband.

"The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are (1) that the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence." In re Estate of Inda, *supra.* See, also, In re Estate of Scoville, *supra;* In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625; In re Estate of Thompson, *ante* p. 375, 44 N. W. 2d 814.

The burden is on contestants to produce evidence

tending to prove each of the four elements stated above, as a prerequisite of their right to have the issue submitted to a jury for determination. See In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80. If any one of the essential elements enumerated is not supported by evidence or reasonable inference drawn from a fact or facts otherwise established, the contention of undue influence must be rejected. The evidence must tend to show undue influence directly in reference to the will in question, and be of such a nature as to control the will of the testator and cause him to do something that he did not intend. Suspicion or supposition of undue influence is not sufficient to require the submission of the question to a jury or to sustain a verdict. In re Estate of Bayer, 119 Neb. 191, 227 N. W. 928; In re Estate of George, *supra;* In re Estate of Bainbridge, *supra.*

It is true that the testatrix lived with her sister Mabel and Stub Hourigan, worked in their restaurant as a cook for a number of years, and after they sold the restaurant she continued to live with them. This covered a period of nearly 30 years. The fact that Mabel and Stub Hourigan endeavored to persuade Etta to make a will, without any evidence disclosing in what form they desired it to be made or any evidence as to what she should do with her property or any persuasion on their part in that respect, is clearly indicative of the insufficiency of the evidence to make a case sufficient to go to the jury on undue influence. The fact that Etta gave in to Mabel on an occasion involving the purchase of a house, or that she and Mabel might have had some difficulty with the work she did for her sister Mary Hafer, does not constitute evidence of undue influence. The fact that she contacted a lawyer, at Etta's request, to come and see Etta for the purpose of making a will, and went to this lawyer's home, then to his office, and furnished an automobile for such purpose when the lawyer had none and did not drive one, is no evidence of undue influence. We can arrive at no other conclusion than to say

the trial court was correct in not submitting the issue of undue influence to the jury.

The contestants objected to Thomas Keenan, a law partner of Grady Corbitt who drafted the will in question and was a material witness to the execution of the will and the mental competency of the testatrix to execute it and its proper attestation, participating in and trying the case for the proponents. The objection was overruled, and contestants predicate error on this ruling.

Grady Corbitt did not participate in any manner in the trial of the case. He testified for the proponents in the prima facie case as to the legal formality of the will, the competency of the testatrix to make it, and lack of influence.

By Article X of the Rules Creating, Controlling and Regulating Nebraska State Bar Association, the ethical standards relating to the practice of law in this state shall be the Canons of Professional Ethics of the American Bar Association, including the additions and amendments as of January 1, 1945, thereto, and those which may from time to time be approved by the Supreme Court. Canon 19 thereof provides in part as follows: "When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel."

Contestants cite opinion 33, American Bar Association Canons of Professional and Judicial Ethics, 1936, p. 100, filed March 2, 1931, wherein it is said: "The relations of partners in a law firm are so close that the firm, and all the members thereof, are barred from accepting any employment, that any one member of the firm is prohibited from taking."

Opinion 220, American Bar Association Canons of Professional and Judicial Ethics, 1947, p. 436, written July 12, 1941, modified opinion 33 cited by the contestants. This latter opinion states: "It is not always improper for an attorney to appear in a case in which his

partner is a material witness—Dicta in Opinions 33, 50, and 185 modified." We deem it unnecessary here to engage in the distinction of opinions 33, 50, and 185.

In opinion 220 it appears that a member of a law firm had represented a decedent in connection with a gift subject to federal gift tax, having drawn all the papers, calculated and paid the tax, and given an opinion to his client that the gift was proper and not made in contemplation of death. The lawyer also represented the decedent in connection with the drafting of his will, and was expected by the decedent to represent his estate, which the executor and the family of the decedent also desired.

We make reference to certain parts of opinion 220 for the reasoning contained therein which we deem applicable to the situation that confronts us here.

We are unable to agree with the reasoning which attaches any impropriety to the participation of a lawyer as a witness and his partner as trial counsel in a matter where the partners have represented the client from the outset and where they are not engaged upon opposing or conflicting sides of the controversy. A distinction may often properly be drawn in cases where a partner's testimony relates to matters occurring in the course of his professional duties, and also in cases where the lawyer has long and intimate familiarity with the details of the matter in litigation, so that his withdrawal will necessarily deprive his client of knowledge and experience of peculiar and irreplaceable value.

The question frequently arises in connection with cases like that here propounded. In such cases the lawyer for the decedent has prepared all the papers, knew the decedent, and knew exactly why he did what he did. His firm, however, naturally represents the decedent's estate, which properly relies on them to sustain the gift (in the instant case the will). By reason of their knowledge of the decedent's affairs they are peculiarly qualified to do so, and unless they can do so

the estate will be deprived of their valuable services.

In such cases there does not appear to be any impropriety in the lawyer who drew the papers and knew the testator testifying to the facts surrounding the execution of the deed of gift (in this case the will), and in his partner representing the estate to sustain it. The possibility of the witness moulding his testimony in order to secure a higher fee for his firm is more than balanced by the injustice to the client of depriving the latter either of a necessary witness or of a specially qualified lawyer. The possible interest of the witness would merely affect his credibility. While it is true that such a situation might require the lawyer for the estate to argue the veracity of his partner, this would be equally the case where the witness was his friend or his near relation. Actually, if the partner of the witness withdrew from the case and asked one of his colleagues at the bar to take his place, the latter would be no less assiduous in standing up for the witness' reputation as would the latter's partner.

We do not construe the words "other counsel" in Canon 19 as necessarily excluding a partner of the lawyer who must become a witness. In our opinion, therefore, it cannot properly be said in every case that a lawyer may not properly appear in a case where his partner could not: but that each case should depend on its own facts.

The attorney trying the case, not being a witness, is not placed in the position of arguing his own credibility, so that no question of ethics or propriety arises. The testimony of the witness attorney in the instant case is not denied or questioned by any witness for the contestants. We hold that under the circumstances as presented in this case, it was not a violation of the Canons of Professional Ethics of the American Bar Association, which have been approved by this court together with the additions and amendments as of January 1, 1945, thereto, and the trial court did not err in permitting

Thomas Keenan to proceed with the trial of this will contest.

For the reasons given in this opinion, the judgment of the trial court in directing a verdict for the proponents should be and is hereby affirmed.

AFFIRMED.