COOK LIVESTOCK COMPANY, INC., A CORPORATION, APPELLEE,
v. REUBEN REISIG, APPELLANT.
74 N. W. 2d 370

Filed January 20, 1956. No. 33852.

*Robert L. Gilbert,* for appellant.

*Mothersead, Wright & Simmons,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by the Cook Livestock Company, plaintiff, in the district court for Scotts Bluff County against Reuben Reisig, defendant, to recover $1,771.42 due for stock feed sold to defendant by plaintiff. The case proceeded to trial before a jury. At the close of all of the evidence the plaintiff moved to dismiss the defendant's cross-petition for want of sufficient evidence to sustain the cause of action pleaded therein. In addition, plaintiff moved for a directed verdict. The trial court sustained both motions. Judgment was entered on the verdict. Defendant filed a motion for new trial. From the overruling of the motion for new trial, the defendant appeals.

The plaintiff is a Nebraska corporation with its principal place of business in Scottsbluff, Nebraska. It alleged in its amended petition that defendant is indebted

to the plaintiff for goods sold and delivered to defendant between September 14, 1953, and January 11, 1954, inclusive, in the sum of $1,771.42 for which amount, with interest and costs, the plaintiff prayed judgment.

Exhibit A, attached to the petition and made a part thereof, sets forth the description of the stock feed as "Alfamix," the price, the debits, credits, delivery dates, and balance due.

The defendant's answer admits the delivery of quantities of Alfamix feed at the dates and in the amounts as alleged by plaintiff, and denies that the feed so delivered was of the nature, quality, and composition as alleged, and that the prices listed and charges made were the fair and reasonable market value or agreed prices for the feed actually delivered.

Defendant's cross-petition alleges in substance that in 1953 the defendant, a farmer and livestock feeder residing near Scottsbluff, owned 77 head of yearling whitefaced steers and heifers and approximately 60 tons of hay, but no corn or grain; that he was desirous of feeding said cattle and marketing them as fat cattle in December 1953, or January 1954; that the plaintiff was engaged in the business of mixing, preparing, and selling livestock feed which it marketed under the trade name of Alfamix; that on or about September 1, 1953, the plaintiff orally represented and warranted that it would mix according to its specifications and would sell to the defendant during the feeding period an Alfamix feed mixture which would be a complete feed, and that it would not be necessary for the defendant to supplement it with any other feed, and which would fatten the defendant's cattle in 120 days if it were fed as a complete feed and if the cattle were fed all they would eat; that the defendant, relying upon said representations, commenced on September 14, 1953, to purchase Alfamix feed, believing the same to be a complete feed and would fatten his cattle in 120 days; that the plaintiff represented that the Alfamix feed supplied to the

defendant during the period from September 14 to November 5, 1953, contained 15 percent corn and 30 percent barley; that the defendant, relying upon said representation fed said feed to his cattle for the purpose of fattening them; that the Alfamix feed sold by the plaintiff to the defendant was not such a feed as would fatten the defendant's cattle in 120 days; that the Alfamix feed sold from the latter part of September to the 15th of November did not contain the percentage of corn and barley as represented by the plaintiff; and that as a result thereof the defendant's cattle did not get fat, and on January 16, 1954, the defendant sold his cattle as feeder cattle at a loss, for which he prayed damages.

The plaintiff's answer to the defendant's cross-petition admitted the defendant's occupation and ownership of cattle; that it was in the business of selling stock feed as alleged by defendant in his cross-petition; that the Alfamix feed supplied to the defendant during the period from September 14 to November 5, 1953, contained 50 percent corn and 30 percent barley, and the feed supplied for the period from November 5 to November 15, 1953, contained 30 percent corn and 25 percent barley; and denied all other allegations contained in the defendant's cross-petition.

The defendant assigns as error the trial court's dismissal of his cross-petition and sustaining of the plaintiff's motion for directed verdict.

A motion for directed verdict or its equivalent must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and such party is entitled to have every controverted fact resolved in his favor and have the benefit of every inference that can reasonably be deduced from the evidence. See Peake v. Omaha Cold Storage Co., 158 Neb. 676, 64 N. W. 2d 470.

In every case, before the evidence is submitted to the jury, there is a preliminary question for the court

to decide, when properly raised, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. See Stolting v. Everett, 155 Neb. 292, 51 N. W. 2d 603; In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176.

With the foregoing authorities in mind, we proceed to a summary of the evidence adduced.

The manager of the Alfamix division of the plaintiff, John Cook, Jr., testified that he had known the defendant for 3 years and sold and delivered to the defendant stock feed from September 14, 1953, to January 11, 1954, for which the defendant paid for a part, leaving a balance due of $1,771.42; and that the formula of the feed sold to the defendant to November 2, 1953, consisted of 15 percent corn, 10 percent molasses, no protein supplement, 30 percent barley, 5 percent dehydrated alfalfa, and the remainder of the 100 percent alfalfa. The defendant was furnished a meal type of feed up to about November 1, 1953, and thereafter a pellet type feed.

The defendant testified that in 1953 he lived near Scottsbluff on 700 acres of land of which 500 acres was river-bottom pasture, and that he owned 78 head of white-faced yearling cattle which he purchased in 1952 when they were calves, 7 or 8 months only, of an average weight of 250 pounds. The same year he wintered them, and ran them on grass the next summer. In 1953 they were in the river-bottom pasture and were put on feed in September. These cattle were not even or uniform in weight, some would weigh 800 to 900 pounds and others 500 pounds, and they would average about 680 pounds each. He had engaged in the livestock business for 12 years and was able to judge the weight of cattle very closely. About the fore part of September he had a conversation with John Cook, Jr., plaintiff's agent, in the Alfamix office. An employee of the plaintiff called "Swede" was present part of the time. The defendant

further testified: "* * * I told him (Cook) what kind of feed I would like to have mixed, * * * I asked him to fix the formula the way I wanted it * * * a certain percentage of corn and barley and different ingredients I wanted put in, I wanted either some cotton cake or some supplement in with it, and he said, '* * * We can save you some money. You don't need all of these supplements, you can take dehydrated hay which will do you the same good and save you money.' * * * I mentioned at the present time that by not putting the cattle on too high a ration we could feed a little longer and still get the fat." Cook said "that would be all right, they could be fattened that way, if anytime you want to fatten them up you would have to get up to about 20 pounds grain per day, that is per head, but we didn't feed quite that much." The defendant was asked: "Q Did you say that you wanted the formula the way it was made out? A Well, I had my opinion of making the formula which I used to feed cattle but he thought this one was better which would save me more money and do the job." With reference to feeding the cattle 120 days, the defendant testified that Cook said they "should have been fat in that length of time with the feed we were feeding." Cook also said he "knowed that would do the job in that 120 days." The first load of feed was delivered September 14, 1953. The prepared mixture was to be fed gradually, taking about 10 days to put the cattle on full feed, and thereafter they were to be fed all they could eat. The facilities for feeding and watering were adequate. The feed at first was a meal or bulk mixture which was fed for a month and a half. The first 10 days of feeding there was little difference in the weight of the cattle. In 20 days the cattle were doing better, and still better in 30 days. The defendant fed the cattle for 124 days.

The defendant further testified that he was feeding close to top quality cattle. After the cattle were fed the meal formula for about 45 days, they were then fed

the same type of feed in pellet form. The change of ration was made close to 60 days after the start of the feeding program. The defendant talked to the Alfamix people and told them the cattle were not doing the job they should be doing on the feed. Swede went out to defendant's place and said the cattle should have been on a higher ration of corn; he believed that would do the job. The defendant testified: "* * * I told him they have had them too long on their ration, to go on and do whatever they wanted to, and so they changed the ration on them." The next load of feed was 40 percent corn and 25 percent barley. The cattle were fed on that ration for about 30 days. After the 30 days, Swede went out again. At that time the defendant thought the cattle had obtained their growth, but could see no gain. He testified: "I told him the cattle didn't do the job, and he said, 'I can see it, myself, they are not doing the job, but I can't figure out why they are not doing the job, they are getting the ingredients, and all I can say is they need more corn and less barley.'" The defendant said: "'Well, if you think that is what it takes, it is up to you guys to change it again,' and so they changed it again." The defendant had Cook come out about 30 days before the cattle were sold, and Cook could not figure out why they were not fat. The defendant testified: "* * * he asked me, 'What do you think causes it?' I said, 'The only thing I can see causes it, I don't think the corn is there.' He said, 'We will put the corn higher and see what they do with it,' * * *." The cattle did not get fat.

The defendant further testified that he sold Maude LeLaCheur, a cafe operator, a heifer on October 21, 1953, which weighed about 800 pounds, and was average. There were other cattle just as good or better that could have been picked out. The LeLaCheurs came back in 30 days for another animal. The testimony of Maude LeLaCheur is to the effect that the cattle were not as fat as they were the month previous when they

were at defendant's place and purchased the heifer.

The cattle were sold in January 1954 to the Scottsbluff Livestock Commission Company. The average price per pound was 18 to 18½ cents. The average price for choice fat heifers was 22 cents per pound.

On cross-examination the defendant testified that the cattle were not weighed when they were put into the feed lot. He estimated that at that time they would vary in weight from 500 to 800 pounds. The cattle ate close to 18 pounds of feed a day. On redirect examination he testified that feeding a ration of this type, the cattle should gain from 2 to 2½ pounds a day.

The cattle were examined by a veterinarian the latter part of December 1953 or the fore part of January 1954. He found no evidence of sickness. The cattle were "quite healthy and bright; there were no depressed animals or gaunt animals." They were "well-warmed up," which means they had just been well started on a fattening ration. He further testified that if cattle do exceptionally well, they will make choice cattle in 120 days. Yearling steers and heifers on full feed would eat 20 to 25 pounds a day. On a 25-pound-a-day ration, 12 or 15 pounds should be grain. He did not know why these cattle were not fat.

One of the operators of the Scottsbluff Livestock Commission Company sales yard who sells a number of cattle each week and also operates a ranch, testified that he runs from 500 to 1,000 head of cattle to feed and fatten out. In his business he has to know good cattle from poor cattle. He sold the 77 head of cattle for the defendant. They were not fat, but a few of the heifers were close to it. He was asked to assume that the cattle weighed 680 pounds in September 1953 and were fed the feeds as the feeds were represented to be by the plaintiff, and was asked whether the cattle would fatten in 120 days. He answered that it would be hard to say whether the cattle would get fat in 120 days as there are a lot of conditions that enter into it.

He further testified that at the weight the cattle were at the start of the feeding program, the heifers might get fat, but the steers would not, it would take 60 days longer for the steers to get fat. On the ration fed, they should have gained from 1½ to 2 pounds a day. He thought the ration was very good. The cattle were of good quality and the price received was comparable with the prices of other feeder cattle. They were not choice fat cattle, but they were "warmed up" cattle.

The witness Grasmick, engaged in the livestock feeding business since 1923 and farming since 1945, testified that he had about 800 head of livestock at that time; that he fed from 1,500 to 2,000 head of cattle a year, and had fed that number for the past 9 years. He was asked substantially the same hypothetical question that was propounded to the preceding witness. His answer was that the cattle should have gotten fat on the ration fed; that the ration was very much a fattening ration; that it was too strong a feed to start cattle on; that on that ration the cattle, at the end of the fattening period, should have been choice fat cattle, except for the fact that perhaps the "hot" rations were too hot a feed; and that the rations should have produced 1.8 to 2.25 pounds gain a day. He further testified that the heifers that sold for $19.10 per hundredweight would be a good grade, and the steers that sold for $20.70 would be a good grade; that a reasonably fat animal will grade good; that many things enter into the cattle feeding business besides the feed, and everyone does not get the same results; that the condition of the cattle when they go into the feed lot has much to do with it; and that in his opinion 30 percent barley in a ration was too much. He testified: "When you get to feeding 30 per cent you are asking for trouble." This condition could have been remedied by feeding some loose hay. In 1953 cattle feeders lost money due to the decrease in prices. The local market for choice heifers in January 1954 was $21 to $22 per hundredweight, and steers

of the same fatness and quality $23 to $24 per hundred-weight.

There is other evidence of like effect as the above which we deem unnecessary to set forth.

The defendant contends that the evidence is sufficient to prove an express oral warranty that the Alfamix feed sold him by the plaintiff was a complete feed which would fatten his cattle in 120 days.

The defendant asserts the evidence shows that the plaintiff did not sell to the defendant the kind of feed he asked for, but rather sold him a different mixture which was represented to be as good, but cheaper; that the statements made by the plaintiff's agent were representations that the feed supplied to the defendant would be a complete feed and of such quality as would fatten the defendant's cattle for market within a period of 120 days, which statements induced the defendant to purchase the feed rather than the feed he originally intended to buy; and that he relied upon the representations of the plaintiff's agent to his damage.

Section 69-412, R. R. S. 1943, provides: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only, shall be construed as a warranty."

In considering the above section of the statutes, the following is applicable.

To maintain an action for damages for false representation the pleader must allege and must prove what representation was made; that it was false and so known to be by the party alleged to have made the representation or else was made without knowledge as a positive statement of known fact; that the pleader believed the representation to be true; and that he relied on and acted

upon it and was thereby injured. See Campbell v. C & C Motor Co., 146 Neb. 721, 21 N. W. 2d 427. See, also, 37 C. J. S., Fraud, § 3, p. 217; Scovel v. Isham, 113 Neb. 238, 202 N. W. 869; Welch v. Reeves, 142 Neb. 171, 5 N. W. 2d 275.

In addition to the above, the general rule, which is supported by numerous decisions in almost all American and British jurisdictions, is that fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future. See 23 Am. Jur., Fraud and Deceit, § 35, p. 794.

It is a general rule that fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events. See Beltner v. Carlson, 153 Neb. 797, 46 N. W. 2d 153.

False representations, in order to found an action in the nature of deceit, must not consist merely of promises to be performed in the future, and generally not merely of expressions of opinion by a vendor as to the quality of his goods. They must be representations of known existing facts. See Esterly Harvesting Machine Co. v. Berg, 52 Neb. 147, 71 N. W. 952.

In the instant case evidence adduced by the defendant disclosed the feed supplied by the plaintiff would fatten cattle in 120 days. Cook's statement that the feed would fatten defendant's cattle could not be considered a statement of fact. Such a statement is nothing more than Cook's opinion that the feed would fatten these particular cattle in that period of time, and under the statutes could not be considered as a warranty, nor under the law as a representation of a present or preexisting fact. At most, the statements made by Cook with reference to the feed were only his opinion and nothing more. The defendant has failed to meet the burden of proof

placed on him. The above contention cannot be sustained.

The defendant contends that there is an implied warranty that the feed supplied to him was reasonably fit for the purpose of fattening his cattle.

Section 69-415, R. R. S. 1943, provides in part: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. * * * (6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."

The evidence shows that the defendant directed the manner in which the feed was to be mixed, except for the dehydrated hay which Cook recommended in place of cotton cake or some other supplement, and which defendant took because of Cook's representation that the dehydrated hay was as good as the cotton cake and would cost less money. There is no evidence in the record that the dehydrated hay was not a proper substitute for cotton cake or other supplement, or had anything to do with the failure of the cattle to fatten. The evidence adduced by the defendant is to the effect that if the feed contained the ingredients which the plaintiff represented it had, and other factors were favorable, the cattle should have fattened in 120 days. The evidence was that the defendant relied on the judgment of Cook only as to the substitution of dehydrated hay for cotton cake or some other supplement to the feed. Under the section of the statutes above set forth and the evi-

dence adduced by the defendant, his contention cannot be sustained.

The defendant next contends that the evidence was sufficient to show a breach of warranty to such extent that the case should have been submitted to the jury.

The defendant asserts there is no direct evidence as to what was actually contained in the feed sold. In this connection the defendant argues that the use of a thing is evidence of the nature of the thing, contending that because there is evidence that his cattle should have gotten fat on the feed supplied them, this is proof that the ration was not as represented. The defendant cites authority to the effect that proof of a breach of warranty may be shown by circumstantial evidence and cites the rule with reference thereto.

The evidence discloses that Cook did warrant the feed contained the various ingredients in the percentages shown upon the invoices of feed furnished. There is no testimony in contradiction to such fact. The defendant alleged in his cross-petition that the Alfamix feed sold from the latter part of September to the 15th day of November did not contain the percentage of corn and barley represented by the plaintiff and that as a result thereof, defendant's cattle did not get fat. There is no allegation in the defendant's cross-petition that the feed sold after November 15th did not contain the percentage of corn and barley and other ingredients as represented, or was defective in any manner. His complaint is only about the feed furnished from September 14 to November 15. The only evidence then as to the cattle failing to gain would be that they failed to gain after November 5th or November 15th. The evidence adduced by the defendant shows that the cattle did quite well from September 14th to November 15th and could furnish no basis for a finding that the feed sold during this period of time was defective or deficient in any manner. There was a change made in the ration November 10th, as shown by the evidence. There is no

allegation in the defendant's cross-petition that this particular feed did not contain the percentage of corn or barley as represented. Nor is there any such allegation as to the feed furnished after that date. If the cattle failed to gain properly, the failure to gain occurred after November 15th and at a time when the defendant in his cross-petition made no allegations as to the defect in the feed. Under such circumstances the authorities cited by the defendant are not applicable.

The defendant also cites cases with reference to the effect of feed fed to livestock which did not contain the proper ingredients in the proportions specified, and under the evidence in the cited cases recovery for damages was had. None of the cited cases are applicable under the factual situation in the instant case and the law applicable thereto, consequently we deem it unnecessary to analyze such cases.

We conclude that the judgment of the trial court should be and is hereby affirmed.

AFFIRMED.