In re Estate of Soren T. Andersen, deceased. Nina W. Andersen, appellee, v. Richard J. Andersen et al., appellants.

128 N. W. 2d 843

Filed June 12, 1964. No. 35658.

· Edward J. Robins, for appellants.

Richards, Yost & Schafersman and Sidner, Lee, Gunderson & Svoboda, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is a will contest in which the validity of an instrument purporting to be the last will and testament of Soren T. Andersen is involved. The trial court entered an order admitting the will to probate, and the contestants perfected an appeal to this court.

The proponent and appellee, the beneficiary of the will, is Nina W. Andersen, the surviving widow of Soren T. Andersen. She will hereinafter be referred to as Nina or as proponent.

The contestants and appellants are Richard J. Andersen, brother, and Emma N. Andersen and Alice Andersen, two unmarried sisters of Soren T. Andersen. They will hereinafter be referred to collectively as contestants, and individually by their given names.

Contestants, in their objections to probate, set out two grounds of alleged invalidity: Lack of sufficient mental capacity to make a will; and undue influence exerted upon the testator by Nina. At the conclusion of contestants' case, the trial court sustained proponent's motion to direct a verdict in proponent's favor; and discharged the jury on the ground that there was not sufficient evidence to go to the jury on the question of mental capacity, and that there was no evidence to meet the burden of undue influence.

One of contestants' assignments of error is that the court erred in not submitting the question of testamentary capacity of the testator to the jury. There is no merit to this assignment. The proponent made a prima facie case as to testamentary capacity, and the contestants did not adduce one iota of evidence thereon. Con-

testants, in their brief, say: "The principal ground of contest in this case is undue influence"; and, "The allegation of mental incapacity was not pursued." The allegation of mental capacity as such, therefore, is not an issue herein.

The only issue before us is the question of undue influence. The burden of proving undue influence devolves upon the contestants. In In re Estate of Hagan, 143 Neb. 459, 9 N. W. 2d 794, 154 A. L. R. 573, we enunciated the rule as follows: "Where a will is attacked on the ground that it was procured by undue influence the burden is upon the party so alleging so to prove."

Contestants predicate error on the refusal of the district court to submit the question of undue influence to the jury. We consider this assignment in the light of the well-established rule that upon a motion for a directed verdict at the conclusion of all the evidence, the motion must be treated as an admission of the truth of all of the material and relevant evidence admitted and all proper inferences to be drawn therefrom. See Curtice Co. v. Estate of Jones, 111 Neb. 166, 195 N. W. 930.

The proponent married Soren T. Andersen, who we will hereinafter refer to as the deceased, on August 22, 1956. His first wife had died in 1952. Proponent was a sister of his brother Richard's first wife, and she had known the deceased since she was 9 years of age. At the time of the marriage she lacked 2 months of being 51 years of age. Deceased was 73 years of age. He died June 11, 1962, at the age of 79. The will in question was executed December 5, 1957. It was drawn and witnessed by Earl J. Lee, his attorney, who had known him for 25 years and was then handling legal matters for him. The will was also witnessed by two officers of the First National Bank of Fremont, the executive vice president and another vice president. Both of them were personally acquainted with the deceased and had known him for some time although neither of them had had business dealings with him. One of them, who was a

former county agent, had known deceased as a farmer and was a member of the church to which he belonged. The attorney and the attesting witnesses testified as to the mental competency of the deceased at the time of the execution of the will and as to the observance of all the legal requirements.

Proponent, who had been previously married and who had moved with her husband from Dodge County in 1938, returned to Nebraska after a divorce in 1954. She lived in Fremont but taught school near Valley in Douglas County. At the time of the marriage, deceased owned approximately 700 acres of Dodge County farm land and considerable personal property. Except for some inheritance from his parents, this was acquired by his own efforts. The courtship which culminated in the marriage was a short one. Nina and the deceased were married 3 weeks after deceased took her and his brother Richard, her deceased sister's husband, and Richard's second wife out to dinner.

Shortly before the marriage, after a dental extraction, the deceased experienced some trouble with the muscles of his eye and face. By 1959, the situation had become progressively worse, and on August 19 of that year proponent took him to the Mayo Clinic where a full medical and neurological examination was made. His problem was strictly physical and not mental. The doctor at the Mayo Clinic diagnosed his difficulty as "Myasthenia Gravis," which is a neuromuscular disease and involves the skeletal muscles. Activity aggravates it, but it usually can be corrected by rest. Except for a little difficulty in articulation, the deceased was able to give his medical history and to answer the questions asked of him by the doctor. Deceased's physical condition subsequent to the will would be immaterial except as it may have had bearing on his susceptibility to influence when the will was made. The mental and physical capacity of a deceased is to be considered in determining what degree of influence will vitiate his will.

In re Estate of Paisley, 91 Neb. 139, 135 N. W. 435. Here, however, there was no sufficient competent evidence that deceased at the time the will was drawn had any physical disability which made him susceptible to influence. The evidence is undisputed that during that time and for at least 3 years thereafter he continued to manage his holdings and to do physical labor on buildings and improvements on his holdings.

Before the will in question, the deceased had executed two previous wills. The first was executd August 21, 1956, the day before the marriage. It stated that in a short time he expected to make Nina White his wife. The will devised an interest in some land in Oklahoma, and a cemetery lot in Kansas, to the brothers of his first wife. The will then provided that if Nina was his wife at the time of his death, she was to receive certain described personal property and an undivided one-half interest in the remainder of his estate. The other undivided one-half interest was devised and bequeathed to his brothers and sisters and to the children of any deceased brother or sister. Nina was not present when this will was drawn. The attorney testified that he instructed the deceased that when he returned to Fremont after the marriage, it would be well to draw another will, correctly identifying his wife.

The attorney drew such an instrument sometime in September 1956, but it was not executed. When the deceased read the will, he asked the attorney how much he could leave his wife. The attorney's testimony is as follows: "A- When Soren read this will he asked me how much he could give to his wife. I told him that he could give all of it to her if he wanted to, but under the law she was entitled to half. He said, 'well, Richard told me that all I—MR KERRIGAN: I object—go ahead. A- 'I could give her was half'. And he said 'I want her to have it all'."

The attorney then drafted another will, dated October ——, 1956, making the same disposition of the Oklahoma

and Kansas properties, giving the rest of deceased's estate to proponent, and naming the proponent and deceased's brother Richard as joint executors. The attorney testified that when the deceased read the proposed draft of the will, he refused to sign it. His testimony is as follows: "A-. He said, 'well, if Nina is going to get all of the property why should Richard be in as a joint executor', and I said, well, that is up to him but he didn't need to because his attorney would help her. So he told me to redraft it without Richard being in there."

The attorney drafted another will in accordance with these instructions, and this will was executed October 11, 1956. The only difference between the one executed and the previous draft is that the proponent is the sole executrix.

The next will executed by the deceased is the one in question, the will of December 5, 1957. Before this last will was drawn, the deceased had conveyed the surface rights in the Oklahoma land, and the cemetery lot in Kansas to his brothers-in-law. This will is exactly the same as the will of October 11, 1956, except that the provisions relating to the Oklahoma and Kansas properties are eliminated therefrom.

The evidence is undisputed that the proponent was present in the attorney's office when the deceased gave him instructions to prepare the wills which were executed subsequent to the marriage. It is the attorney's testimony that before the will in question was executed he asked the proponent to leave his private office and to go into the outer office, so that she was not present when the will was actually executed.

The relations of deceased with the other members of his family had always been good. He and his brother Richard, who was 5 years his junior, worked closely together, and Richard supervised his farming interests when his pipe organ business kept him away. His sister, Emma, who was a year or so older than the deceased, was a biologist and taught at the University of

Nebraska until she retired in 1949. She helped in his home during the last illness of his first wife, and lived with him after his wife died and until he remarried. She had, however, acquired a permanent disability in 1955. Alice, who was the youngest sister, was a scientist with the United States government Department of Agriculture, from which she retired in 1963. Deceased had two other married sisters, Mrs. Carrie Mulloy who was 3 years older than deceased, and Mrs. Norma Powlowski of Boston, Massachusetts, who was 7 years younger. Deceased was also survived by two nephews and a niece, the children of a deceased older brother.

In addition to Richard Andersen and Alice Andersen, who were two of the contestants; the proponent, who was called by them; the attorney who drew the will, who was recalled by them; and a doctor at the Mayo Clinic, whose deposition was offered, the other witnesses called by the contestants were a nephew of the deceased; deceased's sister Norma; and the wife of Richard, all of whom, except the doctor, could be classed as interested witnesses. Not one of the witnesses for the contestants testified as to the testamentary capacity of the deceased or his susceptibility to influence as of the time the will was made. Much other testimony was directed to the fact that deceased's relations with them had always been good, and that the Andersens would be remembered in his will.

The testimony on this latter point is either summarized or listed hereafter. The nephew testified that deceased told him shortly after the wedding that the Andersen family would be remembered in his will. Alice testified that she lived in the home of the deceased during the summer vacations from 1950 to 1956. Sometime during 1954 or 1955, she had conversations with the deceased about his estate. That testimony is as follows: "Q- Will you tell us what he said and what you said and what was the substance of those conversations? MR. CHARLES YOST: That is objected to as incompetent,

irrelevant and immaterial and it involves a transaction with a deceased person and has nothing to do with the competency of making a will, too broad and not sufficient foundation. THE COURT: Overruled. Q- You may answer. A- Well, it (sic) general it would come about by my, perhaps, not wanting to do something and he would say 'there is plenty for all of us', and he would ask me to stop working and I would hesitate about that and repeatedly he said 'there is plenty here for all of us. Don't worry about the money. There is plenty here for all of us', and repeatedly he told me that."

Richard testified that he and the deceased had worked closely together for many years; that on many occasions he and his brother traveled together on buying trips; and that on some of these trips they visited about what he planned to do with his estate. That testimony is as follows: "Q- Mr. Andersen, did you ever discuss on any of these trips or visit with Soren anything about what he planned to do with his estate? A- We talked about it. Q- And will you tell us what those conversations were about? MR. CHARLES YOST: That is objected to as incompetent, irrelevant and immaterial and no proper foundation laid. THE COURT: Overrule. MR. CHARLES YOST: Certainly I am entitled to the time and place. Q- I will try to tie it down. On what occasions just the best you can remember did you have conversations on that subject? A- Well, generally when we were on cattle buying trips. Q- During what years? A- Well, we traveled together so many years. Q- Was it both before and after his marriage? A- Before and after his marriage we talked about it occasionally, yes. Q- Now on those occasions did he ever say anything to you about what his intentions were? A- Well, he asked me what I did and I told him and he said that is just what he was going to do. Q- And did you ever tell him what he had to do? A- I never did. Q- Did you ever made (sic) any statements to him as to what he should do? A- No, I never did tell

him. Q- In those conversations did you make suggestions as to what he ought to do with reference to his sisters? A- No, not what he should do. Q- But you did you tell him what you had done in your will? A- Yes. Q- You said he told you he thought he would do the same thing? A- That is what he said. Q- Did he say what he had done? A- No, he didn't say what he had done. Q- He didn't tell you in so many words what was in his will or any of them? A- No. Q- Prior to the marriage did Soren Andersen tell you what his intentions were - prior to the marriage on the occasions, on those buying trips when he would tell you about or discussed the estate plans, what did he tell you he intended to do with his property? MR. CHARLES YOST: That is objected to as already asked and answered. THE COURT: Overruled. A- Well, this one time he told me I would be appointed administrator. I would know what everything was and what to do with it and that is about the deal. Q- Did he tell you who he was going to give the property to? MR. CHARLES YOST: That is objected to as leading and suggestive. Q- Yes, he did. MR. CHARLES YOST: And no proper foundation laid. THE COURT: Overruled. Q- What did he say he was going to do with his property besides appointing you as administrator of it? A- He said that his family was going to get their large share of his property. Q- He didn't specify the share then? A- No, we didn't go into a discussion of the stuff."

Contestants adduced some evidence of their own holdings. If it had any probative value, it would be to show that they were not in need of a share of the estate of the deceased. The sisters owned 240 acres of farm land 16 miles northwest of Fremont. Emma and Alice owned approximately 500 acres of farm land in Iowa. In addition, they had sufficient personal property to loan money to the deceased for his operations. Alice testified to loaning him $2,000 for an automobile, and $4,500 and $7,000 to purchase cattle. Richard, who is

childless and who remarried 2 years before the deceased, owns 400 acres of land in Nebraska and approximately 1,000 acres in Iowa, and has extensive personal property and cattle interests. Under questioning by his own counsel, he testified that all members of the family except his deceased brother's children were fairly well off.

On this evidence, which has been detailed at length herein, did the trial court err in not submitting the issue of undue influence to the jury? The elements it is necessary to establish to warrant the rejection of a will on the ground of undue influence are: First, that the testator was subject to such influence; second, that the opportunity to exercise it existed; third, that there was a disposition to exercise it for an improper purpose; and, fourth, that the result appears to be the effect of such influence. See In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176.

In In re Estate of Bowman, 143 Neb. 440, 9 N. W. 2d 801, we held: "In making proof, a contestant is not limited to the bare facts that he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts."

We also recognized in In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625, that: "In evaluating the testimony and proper inferences therefrom, it is not always possible to apply the evidence tending to establish improper influence which is referable to the will solely to one of the essential elements. * * * It is permissible therefore not to strive to separate each fact supported by evidence offered as proof of undue influence and allocate it under one or more of the four essential elements requisite to establish the exercise of undue influence, but to view the entire evidence offered by the contestants as proof of this issue and rest the decision upon whether or not the evidence as a whole is of such a substantial nature as to contain some proof of each of the essential elements, and to require that the

issue of undue influence be submitted to and determined by a jury."

We recognize, as we have said on many occasions, that undue influence is usually surrounded by all possible secrecy. It is almost always difficult to prove by direct and positive proof. It is largely a matter of inference from facts and circumstances surrounding the testator, his life, character, and mental condition, *as shown by the evidence,* and the opportunity afforded designing persons for the exercise of improper control. See In re Estate of Farr, 150 Neb. 615, 35 N. W. 2d 489.

In In re Estate of Bainbridge, *supra,* we said the burden is on contestants in a will contest to produce evidence tending to prove each of the four essential elements of undue influence as a prerequisite of their right to have the issue submitted to a jury for determination. Some of the language of the vigorous dissent in In re Estate of Bainbridge, *supra,* which involved a substantial gift to a comparatively new tenant, is particularly apt here. It was there said: "We have repeatedly held that every sane person is entitled to will his property as he sees fit, except where he has been limited by statute. He has a right to give it to relatives, to strangers, or to charity. If the conclusion reached by the majority is correct, the jury is entitled to pass upon the question of undue influence where the relationship of the parties is put before them, even if there is not a syllable of evidence which can be accounted for only on the basis of a disposition of the one charged, to influence the making of the testator's will. The practical effect of such a holding is to make the execution of any will subject to the approval of a jury where indue influence is charged.

"The right of a person to dispose of his property by will rests on a much more secure foundation than this. Isaac v. Halderman, 76 Neb. 823, 107 N. W. 1016; In re Estate of Bose, 136 Neb. 156, 285 N. W. 319; In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284. This case is very important to those who desire to make a

testamentary disposal of their property. One who desires to make an unnatural disposition of his property, for reasons best known to himself, is seriously restricted by the majority opinion. Juries are inclined to sustain charges of undue influence in the drafting of wills which they deem to be unfair to the natural objects of testator's bounty. But the maker of a will has a right to be unfair in disposing of his property without revealing his reasons therefor. I submit that if evidence is not required, which can be accounted for solely on the basis of a disposition to influence the testator, there is no question of undue influence, as a matter of law, to be submitted to a jury. Undue influence cannot be inferred alone from motive or opportunity, and mere suspicion of undue influence on the testator is insufficient to require submission of the question to the jury or to sustain a verdict and judgment. In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37; In re Estate of Woodward, 147 Neb. 270, 23 N. W. 2d 75. See, also, In re Estate of Heineman, 144 Neb. 442, 13 N. W. 2d 569."

Mere suspicion, surmise, or conjecture is not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence. This proposition applies with peculiar force when the result of drawing such an inference is to destroy the effect of a written instrument prepared with deliberation and signed and attested with all formalities required by law for the execution of a will. See In re Estate of Thompson, 153 Neb. 375, 44 N. W. 2d 814.

In In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176, we said undue influence sufficient to defeat a will must be of such character as to destroy the free agency of the testator and substitute another person's will for his own.

In In re Estate of Thompson, *supra,* which in many respects is analogous to the instant case because it involved a childless deceased who left his entire estate to

a second wife of 8 years, we said: "There may be influences directing the will-maker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but, so long as not coercive, they are not undue. Circumstances often arise where such conduct is wholly justifiable.

"The mere opportunity of the wife, when living happily with the husband, to influence the execution of a will favorable to herself is not alone sufficient to warrant submission to the jury of the question of undue influence."

Without discussing the propriety of doing so, we may infer that the proponent, as the wife of the deceased, was in a position to exercise undue influence. We may also infer from the fact that she was the sole beneficiary, if all the other elements are proved, that the will was the result of undue influence. Also, a jury, arguing back from the result, might find she had a disposition to exercise undue influence for an improper purpose. These three inferences, however, must rest entirely upon the fact that the wife is the sole beneficiary, and that the will was made within the first 16 months of the marriage. There is no evidence in this record otherwise from which such inference can be drawn.

Was the testator subject to undue influence, and if so, was it of such a character as to destroy his own free will and to substitute that of his wife for his own? As suggested, the contestants herein did not adduce one iota of evidence as to the nature of the disposition of the deceased. Was he subject to influence? He had been a man of varied interests and had accumulated substantial property. His will was drawn by his own lawyer, an able, conscientious one, who would not have been easily deceived. This lawyer testified as to the competency of the deceased at the time of the execution of the will, and the fact that the will expressed his own intent. There is no sufficient evidence here to

justify an inference that the will was not an exercise of the free will, of the deceased.

Contestants argue that the fact that the will is unnatural, unreasonable, and unjust must be considered. Is it? Deceased had no children. The only other objects of his bounty were collateral heirs. Until the will of October 11, 1956, the proponent would not have received as much as she would take in the absence of a will, because she would have been entitled to a one-half interest in the entire estate, including the Oklahoma land. The contestants were well off financially and not in need of any part of the estate. The testimony of the attorney for the deceased is that when the deceased learned that he could leave all of his property to his wife, he instructed him to draw the will accordingly. It is not unnatural, unreasonable, or unjust for a husband to leave all of his property to his wife in preference to collateral heirs.

If we were to determine on the evidence herein that a jury question existed, we would have to say that the mere fact that a surviving wife is the sole beneficiary is sufficient in and of itself to make a jury question on the issue of undue influence. That is not the law in this jurisdiction.

On this record, we cannot say that sufficient evidence was adduced from which a jury could infer that influence was exerted on the deceased of such a character as to destroy his free agency and to substitute the will of his wife for his own. The trial court so found, and we sustain its findings. The judgment of the trial court is affirmed.

AFFIRMED.